UNITED STATES of America,
Plaintiff-Appellee,

v.

Ronald GRUNSFELD,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Donald Lee INGLE, John Paul Bommarito, Gerald Alfred Phillips, Lawrence Williamson, Defendants-Appellants.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Gilbert John DeMEGLIO,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Lawrence PARMENTIER,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

James Max ELIASON,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Thomas Anthony FLOWERS,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Richard FLOWERS, Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Dennis ESTES, Defendant-Appellant.

Nos. 75–2354 to 75–2361.

United States Court of Appeals,
Sixth Circuit.

Argued June 9, 1976.

Decided and Filed June 10, 1977.

Rehearing Denied July 19, 1977.

Certiorari Denied Oct. 3, 1977.

See 98 S.Ct. 219.

Martin I. Reisig, Detroit, Mich. (Court-appointed CJA), for defendant-appellant in No. 75-2354.

Frederick S. Van Tiem, Asst. U. S. Atty., Detroit, Mich., Reuben H. Wallace, Jr., T. George Gilinsky, Washington, D. C., Richard R. Romero, Washington, D. C., for plaintiff-appellee.

Richard G. Chosid, West Bloomfield, Mich., for defendants-appellants in No. 75-2355.

George E. Woods, Woods, Chase & Huetteman, Detroit, Mich., for defendant-appellant in No. 75-2356.

Joseph Shulman, Detroit, Mich., for defendant-appellant in No. 75-2357.

Edward Wishnow, Southfield, Mich. (Court-appointed CJA), for defendant-appellant in No. 75-2358.

Irving Tukel, Lieberman & Tukel, P. C., Southfield, Mich., for defendant-appellant in No. 75-2359.

Michael S. Friedman, Lustig & Friedman, Southfield, Mich. (Court-appointed CJA), Richard F. Flowers, for defendant-appellant in No. 75-2360.

Louis Lan, Southfield, Mich., (Court-appointed CJA), for defendant-appellant in No. 75-2361.

Before PHILLIPS, Chief Judge and WEICK and ENGEL, Circuit Judges.

PER CURIAM.

Appellants herein are eleven of twenty-five defendants who, with certain unindicted co-conspirators, were charged with a conspiracy to manufacture, distribute and possess with intent to distribute phencyclidine (PCP), a Schedule III controlled substance. 21 U.S.C. §§ 841(a)(1), 846. All eleven appellants were convicted following a jury trial in the United States District Court for the Eastern District of Michigan. In addition, appellant Richard Flowers was convicted of traveling in interstate commerce to promote the manufacture and distribution of phencyclidine, 18 U.S.C. § 1952, 21 U.S.C. § 841, and appellant James Eliason was convicted of four counts of possession of phencyclidine with intent to distribute. 21 U.S.C. § 841(a)(1).

## STATEMENT OF FACTS

The conspiracy count of the indictment charged the named defendants with conspiring between April 1972 and April 1974 to manufacture and distribute phencyclidine in various locations within the State of Michigan. The principal conspirators were appellant Richard Flowers and one Charles Bert, who was the government's chief witness at the trial, having earlier pleaded guilty to the conspiracy count.

After first discussing the venture in April 1972, Bert and Richard Flowers determined the latter would go to Denver and obtain the materials needed for the manufacture of the drug. Accordingly, Flowers drove to Denver, picked up the materials with money provided by Bert, and then returned with them to Detroit. Seeking additional chemicals and lab equipment, Flowers and Dennis Estes went to Denver in June 1972, returning to Detroit with the materials in a van furnished by Estes. For this assistance Estes was paid $500 and promised a preferred price on the phencyclidine to be produced. In Detroit the materials were stored in the basement storeroom of an apartment occupied by Lawrence Parmentier, and thereafter the materials were transported to a cabin at Houghton Lake, Michigan. By the summer of 1972, Richard Flowers and a chemist, Nelson Rudd, had set up a lab at Houghton Lake and were producing phencyclidine powder, under an

agreement that Richard Flowers and Rudd would manufacture the drug while Bert would market it, and each would receive one-third of the profit. Appellants Gilbert DeMeglio and Estes and two others were to participate in the distribution of the drug.

In late 1972 Richard Flowers and Bert moved the Houghton Lake lab to a farm in Kinde, Michigan, and decided to buy a machine which would process the phencyclidine powder into tablet form, thereby making it more marketable. Accordingly, they found such a machine at the residence of appellant Lawrence Williamson, who sold it to them for $8,000 after first demonstrating its working condition and advising them how to use powdered milk in order to "cut" and form the tablets. The machine itself was taken to the residence of Richard Flowers' brother, Thomas Flowers, on North Blair Street in Royal Oak, Michigan, where it was set up and used to produce the tablets by November of 1972. As rent, Thomas Flowers was paid $500 per 10,000 tablets produced.

The marketing of the tablets processed at the North Blair Street residence was done through Bert, who had distributors including appellants DeMeglio and Estes. Parmentier assisted in the distribution in many ways including storing the powder and tablets at his residence and assisting Bert in the collection of the money from the sale of the drug.

In late spring of 1973, Bert approached appellant Donald Ingle for the purpose of obtaining additional chemicals for production of the drug. That summer he also expressed an interest in buying a second tablet-making machine which Ingle said would cost around $6,500. Ingle then took Bert to appellant John Bommarito's address in Redford, Michigan, and the latter then took them to another residence on Rouge Court where the tableting machine was located. This was the residence of appellant Gerald Phillips who was later described by Bommarito as his business partner. These negotiations ultimately resulted in the sale of a tableting machine from Bommarito to Bert through Ingle as an intermediary. This second machine was stored in the garage of Parmentier's residence on Buckingham Street in Warren, Michigan, with an understanding that Parmentier was to receive $500 per 100,000 tablets produced there. This machine was tested by running tablets of powdered milk but was never put into operation to make phencyclidine tablets.

Meanwhile, in the fall of 1972 Bert had met appellant Ronald Grunsfeld, a chemist, and in November of 1973, obtained through him lab equipment and chemicals. Grunsfeld had received $1,000 to purchase the material and $2,500 as a "commission". The materials were picked up by Bert at Grunsfeld's home in Dover, New Hampshire, and with the latter's help, loaded into a U–Haul trailer and returned to Michigan. The next month Grunsfeld delivered to Bert in Detroit a shipment of chemicals and lab equipment which he had ordered the previous month. Bert placed three or four such orders with Grunsfeld.

Using primarily the materials supplied by Grunsfeld, Bert set up a third lab in December, 1973 in a residence on Ferguson Street in Detroit. The Ferguson lab began production of powder that month and continued to operate until February 26, 1974. Some of the Ferguson powder was sold to the appellant James Eliason and another distributor, but most of it was processed into tablet form at the North Blair Street residence and sold from there to distributors. In November and December 1973, Richard Flowers became a silent partner in this operation as well, under an agreement whereby he was to receive 20% of the profits.

In January 1974 Bert flew to Chicago for the purpose of selling and distributing the phencyclidine powder and tablets processed at the North Blair Street residence. He met Eliason in Elgin, Illinois, making a sale to him on January 4 and 5. On January 8 Eliason made sales to two undercover agents of the Drug Enforcement Administration. Eliason boasted to the agents that his organization could make 1,000,000 tablets in ten hours and that they had sold 5,000,000 the previous summer.

Bert's participation in the conspiracy came quickly to an end on February 27 when he and several of his distributors were arrested while in the process of selling some phencyclidine powder. Thereafter a search warrant was executed on February 28, 1974 at the Ferguson lab, producing large quantities of the drug, chemical ingredients and lab equipment. Another warrant was carried out at Parmentier's residence on Buckingham Street, resulting in the seizure of the tableting machine there. On April 12, 1974, warrants were executed at the Kinde laboratory and at the North Blair Street residence, yielding further equipment, chemical ingredients and the other tableting machine.

## I. SUFFICIENCY OF EVIDENCE

Of the eleven defendants, all but Richard Flowers, Thomas Flowers and Lawrence Parmentier claim that the evidence was insufficient to convict them of conspiracy.

### A. BUYERS

A claim common to DeMeglio, Eliason and Estes is that while there was proof they purchased PCP from the manufacturers, this alone does not render them guilty of conspiracy. In this respect they rely upon a number of cases in which it is generally held that a buyer-seller relationship is not alone sufficient to tie a buyer to a conspiracy. *See e. g., United States v. Sperling*, 506 F.2d 1323, 1342 (2d Cir. 1974), *cert. denied*, 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439, 421 U.S. 949, 95 S.Ct. 1682, 44 L.Ed.2d 103 (1975); *United States v. Torres*, 503 F.2d 1120, 1123–24 (2d Cir. 1974); *United States v. Bostic*, 480 F.2d 965, 967–69 (6th Cir. 1973); *United States v. Ford*, 324 F.2d 950, 952–53 (7th Cir. 1963); *United States v. Koch*, 113 F.2d 982, 983 (2d Cir. 1940).

An analysis of the case law, however, indicates that where there is additional evidence beyond the mere purchase or sale, from which knowledge of the conspiracy may be inferred, courts have upheld conspiracy convictions. For example, in *United States v. Mayes*, 512 F.2d 637, 647 (6th Cir.), *cert. denied*, 422 U.S. 1008, 95 S.Ct. 2629, 45 L.Ed.2d 670 (1975), conspiracy convictions of several defendants were upheld where it was shown that at the time they purchased stolen cars, which were the object of the conspiracy, they were aware of the existence of the operation in some detail. Here there is much more evidence than the simple act of purchase of PCP to tie these defendants to the conspiracy.

DeMeglio worked closely with the other conspirators in providing an outlet for the PCP and arranged for a continuing relationship and extension of credit from Bert. Likewise, Eliason's involvement, while primarily consisting of purchases of the tablets, also was further evidenced by his representation to undercover agents of the Drug Enforcement Agency that he could get for them 1,000,000 tablets for PCP in ten hours and that his organization had sold 5,000,000 over the summer.

Estes not only made purchases from Bert, but in June, 1972, drove in his own truck with Richard Flowers to Denver and returned to Detroit with additional chemicals for the production of PCP. He not only received $500 for his services, but a preferred price on the drug itself. We conclude that all of these circumstances distinguish the involvement here from that of a mere casual sale by someone who was unaware of the scope of the conspiracy. The fact that defendants were unable to purchase PCP on credit from Bert itself creates an inference of an on-going relationship with the conspiracy, *Davis v. United States*, 279 F.2d 576, 578 (4th Cir. 1960), as does the large volume of narcotics actually purchased. *United States v. Aiken*, 373 F.2d 294, 300 (2d Cir.), *cert. denied*, 389 U.S. 833, 88 S.Ct. 32, 19 L.Ed.2d 93 (1967).

### B. SUPPLIERS

Appellants Grunsfeld, Williamson, Ingle, Bommarito and Phillips supplied equipment, chemicals and machinery to the main conspirators. Generally they contend that the mere sale of these materials to the main conspirators, was not legally suffi-

cient to constitute participation in the overall conspiracy. They rely primarily on the Supreme Court's ruling in *United States v. Falcone*, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940).

In *Falcone*, involving a scheme for the illegal production of liquor, the Supreme Court held that where the evidence showed the defendants sold sugar, yeast and cans, knowing the materials would be used for an illegal purpose, but where it could not be inferred that they had knowledge of the conspiracy itself, the convictions could not be sustained. In the absence of such additional evidence, the simple sale to a conspirator was not sufficient. Three years later, however, the Supreme Court decided *Direct Sales Co. v. United States*, 319 U.S. 703, 63 S.Ct. 1265, 87 L.Ed. 1674 (1943), in which the defendant was a mail order drug corporation selling large quantities of morphine sulfate. Conspiracy convictions were affirmed where the sales had been in such quantities and for such a length of time to warrant the inference that the drug supplier had knowledge of and intended to promote the purposes of a drug conspiracy. The company's granting of large discounts on quantity purchases and its refusal to heed warnings by the government that certain doctors were purchasing large amounts of drugs for illegal purposes also suggested complicity in the scheme. The Court explained:

> Petitioner obviously misconstrues the effect of the *Falcone* decision in one respect. This is in regarding it as deciding that one who sells to another with knowledge that the buyer will use the article for an illegal purpose cannot, under any circumstances, be found guilty of conspiracy with the buyer to further his illegal end. The assumption seems to be that, under the ruling, so long as the seller does not know there is a conspiracy between the buyer and others, he cannot be guilty of conspiring with the buyer, to further the latter's illegal and known intended use, by selling goods to him. The *Falcone* case creates no such sweeping insulation for sellers to known illicit users. That decision comes down merely to this, that one does not become a party to a conspiracy by aiding and abetting it, through sales of supplies or otherwise, unless he knows of the conspiracy; and the inference of such knowledge cannot be drawn merely from knowledge the buyer will use the goods illegally. 319 U.S. at 709, 63 S.Ct. at 1268.

Here there was evidence before the jury from which it could infer that each of the defendant suppliers did in fact have knowledge of the conspiracy's existence. Grunsfeld was a chemist, involved in three or four large purchases of materials over a period of time. He made large profits in the sale of chemicals to Bert and, in fact, the profit on two such sales exceeded the cost of the chemical itself. Like the corporate defendant in *Direct Sales*, he promoted the very purposes of the conspiracy rather than merely supplying it. Unlike *Falcone*, the materials which Grunsfeld obtained for the conspiracy were hard-to-get items which are often used in the production of illegal drugs.

The evidence regarding Donald Ingle and John Bommarito amply shows their knowledge of the conspiracy. Bert had contacted Ingle to inquire if he could obtain specific chemicals for the production of PCP. Ingle responded that he would, but apparently never actually obtained the chemicals. The second tableting machine was purchased in 1973 through Ingle from Bommarito for a price of $6,500. Ingle and Bert had gone to Phillips' residence on Rouge Court in Redford, Michigan, to examine the machine. There they met Bommarito who showed the machine to Bert and explained its proper functioning. When Bert described its intended use, Bommarito said that he was willing to purchase all the tablets produced from the machine, thus providing incentive and encouragement for the conspiracy, even though time expired before the machine could be put into production.

■ The evidence against Gerald Phillips is primarily circumstantial and relates to the same negotiations for the sale of the tableting machine in which Ingle and Bom-

marito were involved. Phillips owned the residence on Rouge Court in Redford visited by Bert and Ingle. Bert identified him as being present in the house during the discussion of the machine, which was being kept in the garage. Subsequent testimony by witness Michael Budnor revealed in more detail the continuing and extensive relationship between Phillips and Bommarito and showed that Phillips was well aware of the role of the machinery in the manufacture of PCP. While this testimony related to a later negotiation for the purchase of a tablet-making machine not employed in the conspiracy, it also revealed that Bommarito asserted, in Phillips' presence, that the two of them were business partners. This was an admission by silence, *United States v. McKinney*, 379 F.2d 259, 261–62 (6th Cir. 1967), which occurred during the period of the conspiracy. A permissible inference would be that a business relationship between the men had also existed at the time of the earlier sale of a machine to Bert.

Likewise Lawrence Williamson knowingly advanced the purposes of the conspiracy by selling a tableting machine to Bert in the fall of 1972 for $8,000. Further, he demonstrated its use to Bert and Flowers and instructed them in "cutting" the PCP. His involvement is not unlike that in *United States v. Yaniz-Cremata*, 503 F.2d 963 (5th Cir. 1974). There three co-conspirators had smuggled cocaine into the country and went to the defendant's barber shop where he supplied them with milk, sugar and bicarbonate, instructed them on how to cut cocaine and warned that Miami was too hot for operating. The Fifth Circuit concluded that while mere association with others is not enough evidence to support a guilty verdict, the defendant did more in the case at hand. He supplied materials to cut the cocaine.

> This aided materially in the distribution of the cocaine. From this act, coupled with the contacts appellant had with Rodriguez, Breeden and Anteparra . . . and his advice that the Miami area was "hot", the jury could reasonably conclude beyond a reasonable doubt that appellant knowingly became a participant in a conspiracy to distribute cocaine. No more was required. 503 F.2d at 964.

## II. SEVERANCE OF DEFENDANTS

Phillips, Ingle, Bommarito, Williamson, Thomas Flowers and Richard Flowers, all argue that it was reversible error for the district court not to grant their several motions for severance from the main case. Phillips, Ingle, Bommarito and Williamson argue that since their involvement was limited to single, isolated acts, it was unfair to associate them with the very involved activities extending over a period of almost two years, thereby enhancing the possibility of confusion by the jury. They have not indicated any specific instances where the jury might have been confused by the scope of the proofs or was unable to limit evidence to only one defendant when necessary.

Their claim differs very little from that made by defendants Fowler and Cook in *United States v. Mayes, supra.* It is sufficient, we think, to observe as we did in *Mayes* that

> While this practical consideration merits our careful attention, it assumes that the prosecution was entitled to prove only the actual involvement of each defendant charged, and not the scope of the entire conspiracy. Whether the trials were joint or separate, the government could prove the entire scope of the conspiracy, though one defendant's role in it was limited. We find no error in the refusal of the trial judge to grant any of the motions for a severance. 512 F.2d at 645 (footnote omitted).

Richard and Thomas Flowers claim that they should have been granted severance because the evidence showed the existence of three separate conspiracies, while they were charged with only one overall conspiracy. Although the jury was instructed on the finding of single or multiple conspiracies and no objection is made to that charge, these appellants contend that they were unduly prejudiced by the voluminous quantity of evidence unrelated to the con-

spiracy in which they were alleged participants.

Whether single or multiple conspiracies have been shown is usually a question of fact to be resolved by the jury under proper instructions and to be considered on appeal in the light most favorable to the government. *See United States v. Etheridge,* 424 F.2d 951, 953, 963–65 (6th Cir. 1970), *cert. denied,* 400 U.S. 993, 1000, 91 S.Ct. 463, 27 L.Ed.2d 442 (1971). Even if there is a "variance" in the proofs showing multiple conspiracies rather than a single conspiracy, reversal is required only where substantial rights of the appellants are involved. *United States v. Miley,* 513 F.2d 1191, 1207 (2d Cir.), *cert. denied,* 423 U.S. 842, 96 S.Ct. 74, 46 L.Ed.2d 62 (1975).

Appellants' reliance upon *United States v. Bertolotti,* 529 F.2d 149 (2d Cir. 1975), is misplaced. There the Second Circuit held that four separate narcotic conspiracies were proved, but refused to conclude, as it had done in *Miley, supra,* that the joint trial was harmless. The court found that the only common factor linking the transactions was the presence of the same two conspirators, but that there was no evidence to show that the two were conducting what could seriously be called a " 'regular business on a steady basis' ". 513 F.2d at 1207. In addition, there was a recurrent problem in the Second Circuit with the practice of the United States Attorney's office of combining several conspiracies and attempting to try them in a single case.

Our review, however, satisfies us that, although the principal conspirators in all events were Bert and Richard Flowers, they were in fact conducting a regular business on a steady basis. At all times there was a loose knit organization between the main conspirators, and while there was some kind of split between Bert and Richard Flowers, it can be inferred from the evidence that Flowers still continued as a silent partner in Bert's operation.

## III. THE SEARCH WARRANTS

The grand jury indictment of July 10, 1974 was preceded by the execution of at least four search warrants, which produced evidence employed at the trial. The validity of three of these warrants is challenged on appeal. Richard Flowers' farmhouse at Kinde, Michigan, and Thomas Flowers' home on North Blair Street in Royal Oak, Michigan, were searched pursuant to two warrants and certain items were seized. Likewise, a search was made of Parmentier's home on Buckingham Street in Warren, Michigan. They appeal from the denial of their respective motions to suppress. In addition, co-defendants Williamson and Grunsfeld challenge the admissibility of the evidence as it related to their cases.

From our review of the evidence, we think it is sufficient to hold that neither Williamson nor Grunsfeld had standing to seek suppression of the evidence derived from these premises, as they were not present at the time of the searches and alleged no possessory or proprietary interest therein. *See Alderman v. United States,* 394 U.S. 165, 174, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969); *Simmons v. United States,* 390 U.S. 377, 389, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); *United States v. Delguyd,* 542 F.2d 346 (6th Cir. 1976); *United States v. Hodge,* 539 F.2d 898 (6th Cir. 1976); *United States v. Dye,* 508 F.2d 1226 (6th Cir. 1974), *cert. denied,* 420 U.S. 974, 95 S.Ct. 1395, 43 L.Ed.2d 653 (1975).

We are also satisfied that there were no deficiencies in the procedures involving the issuance and execution of the warrants for the searches of the residences of Richard Flowers, Thomas Flowers and Lawrence Parmentier.

The warrants for the search of Thomas Flowers' and Richard Flowers' residences were issued on April 12, 1974 by a magistrate in reliance upon essentially identical affidavits filed the same day by Special Agent James Seward of the Drug Enforcement Administration. The affidavits recited information obtained from two confidential informants and surveillance of the two locations over a long period of time.

They stated that an informant had observed the Kinde laboratory in operation until approximately two months before the date of the affidavit. Thereafter, Richard Flowers temporarily discontinued the use of that PCP lab for about two months because he feared that the "heat was on" after Charles Bert's arrest on February 27, 1974. Renewed activity at the Kinde farm was indicated by the information of a special agent, Jessie Back, to the effect that he smelled "a distinct odor of the ether (used in the production of PCP) in the vicinity from his vantage point of Crockard Road" and observed a 1969 Ford owned by Richard Flowers parked on the premises. The district judge interpreted the affidavit to mean that these observations occurred shortly before the filing of the document.

Regarding activity on North Blair Street, the affidavits stated that an informant observed the installation of a tableting machine in the home during the fall of 1972, which was used for converting the PCP powder into tablets. In November and December of that year, numerous individuals had been observed carrying plastic bags of tablets in and out of the house. There was evidence of renewed activity on April 9, 1974, to the extent that an agent noticed Thomas Flowers' and Richard Flowers' cars parked at the premises and observed certain packages being carried in and out. Finally, paragraph three of the Seward affidavit stated:

> Confidential informant number one advised affiant that on Saturday, April 6, 1974 the informant was on the premises of 1216 Blair, Royal Oak, Michigan and at that time observed a tableting machine in the basement of that premises.

The evidence at the suppression hearing convincingly supported the district judge's finding that the information contained in paragraph three was acquired by an illegal entry into the home by Charles Bert, and that the entry was attributable to government action. Special Agent Seward and Bert were essentially in agreement as to the conversation which had taken place between them before Bert broke into the Blair Street residence.[1]

1. In his opinion and order denying the motion to suppress, the district judge noted the relevant portions of testimony:

   Agent Seward testified in the following fashion:

   Q. Who raised the point of making an entry into the premises?
   A. I raised the issue.
   Q. And in what form did you raise it?
   A. I instructed the informant that I desired to know if the items that he had informed me of were still located at that premises.
   Q. What was the informant's response to that?
   A. He asked me if I desired him to burglarize the home.
   Q. And what did you answer in response to that?
   A. No.
   Q. Was there any further discussion?
   A. Yes. I indicated to the informant that under no circumstances did I wish him to burglarize the home, and that I indicated to him that he should use his intelligence and his acquaintanceship with the defendant at that residence to gain entry.
   Q. Now who did you mean by the resident of that residence?
   A. Thomas Flowers.

   In recounting his conversation with Agent Seward, defendant Bert testified:

   A. He [Agent Seward] says
   "I've got to know if that tableting machine is still at the Blair residence."
   And I says:
   "There's no way that I can determine that."
   I said—what I said busted at that point, and I says:
   "Those people aren't going to get near me within a mile." I said, "I can't walk up to the door and say, hey, is there a tableting machine in there?"
   It was just no good. So he says:
   "Well, I've got to find out if that machine is in there."
   And I says:
   "I can't do that. I know Richard Flowers isn't going to talk to me. I know Tom Flowers isn't going to talk to me. How do you expect me to get about doing that?"
   He says—quote—"I don't really care how you do it, but do it."
   And I says:
   "What you're basically saying then is I've got to break and enter that premises to find out if that machine is in there."
   He says:
   "No, I'm not telling you to do that."
   And I says:
   "What you are telling me—and quotes—'You want me to break the law to help the law', and that's the exact words I used, and he says:

Based upon the testimony of Bert and Seward, the district court correctly concluded:

> [T]he conversation between defendant Bert and Agent Seward, which resulted in defendant Bert's illegal entry onto the premises on 1216 Blair Street, Royal Oak, Michigan, involved implicit governmental instigation and collusion with Bert's illegal conduct.

Based upon this finding the trial judge suppressed paragraph three of the affidavits submitted for issuance of the search warrants for *both* the farmhouse at Kinde and the house on North Blair Street. He did not, however, suppress the evidence obtained as the result of the execution of the search warrants at either location. He reasoned:

> The suppression and deletion of paragraph three (3) of the identical affidavits does not, however, justify suppression of the rest of the information contained in the affidavits. The information contained in paragraph three (3) was independent of the remaining information in the affidavits. There has been no showing that the other information in the affidavits was derived from the information gathered and stated in paragraph three (3) and was, therefore, the "fruit of a poisonous tree". (citations omitted). The information contained in the affidavits was gathered from a number of different sources over a period of time without any reference to a particular piece of information which served as the impetus for further discovery of additional information. The remainder of the affidavits must, then, be analyzed in light of the defendants' second contention that the information contained in the affidavits was too remote in time from the date of information to the date of the submission of the search warrants.

The district judge then held that in light of the evidence of the continuation of the conspiracy over a long period of time, the affidavit, even without deleted paragraph three, evidenced probable cause for the issuance of the search warrants.

This court has observed that where tainted information is of major importance or forms more than a minor portion of the information contained in the affidavits supporting a search warrant, doubt may arise as to whether the warrant would have been issued by the magistrate without the tainted information, and a reviewing court may be justified in ordering suppression of evidence obtained pursuant to the search. *United States v. Langley,* 466 F.2d 27, 35 (6th Cir. 1972); *United States v. Nelson,* 459 F.2d 884, 889 (6th Cir. 1972). This approach to review of probable cause determinations by magistrates is intended to protect potential victims of unlawful searches while affording due deference to the judgments of magistrates in individual cases.

In the present case, no doubt regarding the propriety of the search warrant arises because the tainted information in paragraph three of the affidavit was merely cumulative evidence of criminal activity at the premises in question, and substantial probable cause for the issuance of the warrants was present without reference to the tainted information.

The warrant at issue states the purpose of the search of Thomas Flowers' house was to look for:

> Controlled Substances, to wit, tableting Phencyclidine, and paraphernalia and machinery used for the manufacturing, processing, distribution and sale of Phencyclidine, material to dilute Phencyclidine and to manufacture Phencyclidine tablets, containers and instrumentalities to manufacture, dispense, sell or process Phencyclidine and property constituting

No, I'm not telling you to do that, but I've got to know if that machine is in there, and I says:

"I can't get head or tails from you."

He said:

"I don't care. I've got to know and it will help your case."

I says:

"Well, then, let me do what I have to do, and I'll go see if it's there. I'll try to find out for you and I'll let you know."

evidence of offenses of Title 21, U.S.Code, Section 841(a)(1) and 846.

The affidavits before the magistrate demonstrated that this case involved a conspiracy extending over a period of many months. There was substantial information documenting that in late 1973 the farmhouse in Kinde, Michigan, was being used by Richard and Thomas Flowers as a PCP factory. This information was brought up to date by the affiant's statements in April of 1974 that "two months ago" the laboratory was in operation, and by the observations of a special agent for the Drug Enforcement Administration that there were odors associated with the making of PCP permeating the farmhouse area during his surveillance in April.

The affidavit before the magistrate indicated a pattern of conduct whereby the defendants would manufacture the PCP in a lab at one location, then remove the powdered PCP to a second location for tableting. The accounts of activity at the Blair Street premises of Thomas Flowers fit perfectly into the pattern described by the agents in the affidavits before the magistrate.

The informants stated that a tableting punch was installed in the Blair Street home of Thomas Flowers in 1972. On several occasions through December of 1973, Thomas Flowers, Richard Flowers and Charles Bert were observed carrying powdered PCP out of the Kinde, Michigan, premises and bags of tablets out of the Blair Street premises. In April of 1974 agents observed automobiles and a pick-up truck belonging to Thomas Flowers and Richard Flowers coming and going from the Blair Street property with the occupants delivering parcels and then leaving with apparently different parcels. One of the vehicles involved was also seen by a DEA agent at the Kinde, Michigan, farmhouse at a time when the agent detected strong ether odors associated with the manufacture of PCP.

As the district court determined, the defendants' pattern of conduct involving the two houses was sufficiently brought down to date in April of 1974 to overcome defendants' contentions that the information in the affidavits was stale. The tainted evidence of tableting activity at the Blair Street premises was cumulative evidence of ongoing criminal activity at that property. We hold that the district court correctly denied Thomas Flowers' motion to suppress.

Richard Flowers argues that since the affidavit supporting the search warrant for the Kinde farmhouse contained an identical paragraph three based on the illegal entry, this warrant must be invalidated and that the evidence seized pursuant thereto should have been suppressed. Although we hold that the identical paragraph three did not invalidate the search warrant for Thomas Flowers' Blair Street premises, we further conclude that Richard Flowers had no standing to contest the use of the unlawfully discovered information, because he was not a victim of the illegal search of the home on North Blair Street.

While Richard showed that his brother, Thomas, had given him a key and permission to enter the house on North Blair, this was the sole evidence pertaining to his relationship to the house. We find it insufficient to give him the necessary proprietary interest and expectation of privacy to complain of the illegal entry. *Compare United States v. Williams,* 536 F.2d 810, 812–13 (9th Cir. 1976), *with United States v. Burke,* 506 F.2d 1165, 1170–71 (9th Cir. 1974), *cert. denied,* 421 U.S. 915, 95 S.Ct. 1576, 43 L.Ed.2d 781 (1975). Richard was not present on the premises at the time of the search or even in the vicinity. Furthermore, he did not assert any possessory right in the tableting machine seen by Bert. *See United States v. Delguyd, supra,* 542 F.2d at 350. Even if the evidence at trial revealed that he had purchased the tableting machine, this circumstance would not give him standing since the burden was on the appellant to demonstrate his interest when he moved to suppress the evidence. *United States v. Prueitt,* 540 F.2d 995, 1005 (9th Cir. 1976).

Richard Flowers' claim of automatic standing under *Jones v. United States,* 362

U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), is misplaced. We have since held that *Simmons v. United States, supra,* eliminated that rule. *United States v. Delguyd, supra,* 542 F.2d at 350. Even if it were applicable, we note that he was not charged with a possession offense, but rather conspiracy to manufacture, distribute and possess a controlled substance. *See United States v. Delguyd, supra,* 542 F.2d at 350 n. 2.

## IV. Other issues

### A. Grunsfeld: Prejudicial comment

Numerous complaints are made concerning evidentiary rulings made by the court during the extensive trial of the defendants. Only that raised by defendant Ronald Grunsfeld, in our judgment, justifies any extended comment. During the cross examination of Agent Seward by Grunsfeld's counsel, the following colloquy took place:

Q. Mr. Seward, did you think Mr. Grunzfeld (sic) was going to be a witness in this case and not a defendant?

A. He was a defendant at that time. However, he had indicated to me that he was going to plead guilty.

In their context the questions were part of a defense effort to probe the alleged failure of Agent Seward to record Grunsfeld's comment that he did not know what was being done with the chemicals he supplied. Seward's response to the question was stricken from the record and the court gave an appropriate cautionary instruction. However, Grunsfeld's counsel claims that this was such a plain and egregious error on the part of an agent who ought to have known better that Grunsfeld's conviction should be reversed.

It must be admitted that the statement, if believed by the jury, would indeed be damaging to Mr. Grunsfeld. But in the context in which it occurred, the answer was fairly responsive to the question put to him by Mr. Grunsfeld's counsel, was an isolated circumstance not elicited by the prosecutor, and was promptly followed by a cautionary statement. While this circuit has been particularly alert to the prejudice arising from this type of comment, *United States v. Long*, 323 F.2d 468, 471–72 (6th Cir. 1963); *Oliver v. United States*, 202 F.2d 521 (6th Cir. 1953), we decline to reverse where, as here, the answer was not elicited by the prosecution but by the defendant's own counsel, was generally responsive to the question, and was isolated in its nature.

### B. Flowers: Authority of Strike Force Attorneys

Richard and Thomas Flowers claim that the strike force attorneys from the Justice Department who tried the case were without authority to act in this particular case under 28 U.S.C. § 515. This claim is without merit. *Schebergen v. United States*, 536 F.2d 674 (6th Cir. 1976); *United States v. Murrie*, 534 F.2d 695, 697 (6th Cir. 1976).

### C. Eliason: Failure to Produce a Witness

Appellant Eliason contends that his conviction on a substantive count of distributing PCP should be reversed because the government did not produce a cooperating informant, as requested before trial by defense. We note that he was convicted on five counts and received a sentence on each of four years, the sentences to be served concurrently. Because the contention has minimal merit and applies only to one count, this is an appropriate circumstance for invoking the concurrent sentence rule and declining review. *See Barnes v. United States*, 412 U.S. 837, 93 S.Ct. 2357, 37 L.Ed.2d 380 (1973); *United States v. Burkhart*, 529 F.2d 168 (6th Cir. 1966); *Ethridge v. United States*, 494 F.2d 351 (6th Cir.), *cert. denied*, 419 U.S. 1025, 95 S.Ct. 504, 42 L.Ed.2d 300 (1974). Here it is clear that there are no meaningful collateral effects from the one conviction being challenged.

This was a lengthy and complicated trial. We have considered numerous other complaints in the several briefs of the parties, but we find no other error.

Accordingly, the convictions of all the defendants are affirmed.

ENGEL, Circuit Judge, dissenting in part and concurring in part.

The facts which produce my dissent can be briefly summarized.

Uncertain that he could procure a search warrant upon information he then possessed, Special Agent Seward of the United States Drug Enforcement Administration persuaded a paid government informant and convicted felon then under indictment, Charles Bert, to break into the home of the defendant Thomas Flowers for the sole purpose of confirming the continuing presence therein of a tableting machine used in the production of drugs. This was information which Seward conceived necessary to include in an affidavit for a warrant to search the same premises for the same machine. On the night of April 6, 1974 Bert broke into and entered the home of Thomas Flowers and confirmed the machine's presence there. Seward then incorporated that information in his April 12 affidavit, and the federal magistrate issued the search warrant, not knowing how the information had been obtained.

On the basis that the illegally-obtained information was cumulative and that there were other untainted facts to support a finding of probable cause and to overcome a claim of staleness, the majority would uphold the search. I respectfully suggest that the result reached here conflicts with our circuit's decisions in *United States v. Langley*, 466 F.2d 27 (6th Cir. 1972), and *United States v. Nelson*, 459 F.2d 884 (6th Cir. 1972), and is wholly at odds with the rationale of our decision in *United States v. Luna*, 525 F.2d 4 (6th Cir. 1975). In my opinion it fails to comport with our constitutional and supervisory duties as set forth by the Supreme Court in numerous decisions beginning with *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). *See, e. g. Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); *McNabb v. United States*, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943); *Olmstead v. United States*, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928); *Byars v. United States*, 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520 (1927); *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). I am unable to square the majority ruling with the responsibility imposed upon our court in the cited cases.

It must be remembered that we are not dealing here with federal court application of the exclusionary rule to state litigation. *See, e. g., Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). At issue is the unlawful conduct of a federal officer and the introduction in a federal trial of evidence seized by virtue of a search warrant fraudulently obtained from a federal magistrate. Our responsibility here is direct.

It is apparent that the district court considered its role to be merely to ascertain whether the remaining and untainted information in the affidavit would have been sufficient to support a magistrate's determination of probable cause and issuance of the warrant. If this were the standard, I would be inclined to uphold the search, although entertaining some reservations concerning the staleness of the information pertaining to the North Blair premises. It is not, however.

In ruling on the motion to suppress evidence, the district court did not consider this circuit's opinions in *United States v. Langley, supra*, and *United States v. Nelson, supra.* In *Langley* the affidavits for search warrants were tainted by the inclusion of information obtained when an otherwise valid but warrantless search of the exterior portions of a house and surrounding yard exceeded the permissible scope of a robbery investigation. The court held that an officer who entered an Avis truck and copied down markings on certain boxes, while ostensibly checking for the intruder, violated the Fourth Amendment. In *Nelson*, four warrantless searches preceded the issuance of a search warrant and were used to produce information for the affidavit in support of that warrant. Two of the searches by a motel owner on his own initiative were held to be beyond the reach of the Fourth Amendment. However, two subsequent searches by the police, after sus-

picious circumstances were reported to them by the motel owner, were held to violate Fourth Amendment rights.

In *Langley* the court held that the tainted information which was included in the supporting affidavit for the search warrant was not significant in establishing probable cause. However, Judge Miller cautioned:

> It must be emphasized that where such tainted information comprises more than a *very minor portion* of that found in an affidavit supporting a warrant to search, the warrant must be held invalid.

466 F.2d at 35.

In *Nelson* the affidavit was held to be fatally tainted and the search was therefore unlawful. In a concurring opinion, Judge Miller observed:

> This is not a case where the tainted information which is included in an affidavit along with untainted information is trivial or insignificant or merely cumulative. It is a case where the tainted information is of such major importance that its absence creates grave doubt that the warrant would have been issued without it. If we are to uphold the fundamental purposes of the Fourth Amendment and the exclusionary rule by which it is implemented, it is my belief that the practice indulged in by the officers in this case must be condemned and the tainted evidence upon which appellants were convicted suppressed.

459 F.2d at 895 (footnote omitted). Judge Edwards, writing the opinion for the court, specifically agreed with Judge Miller's analysis of this issue.

The conduct in the instant case was not merely an impermissible extension of otherwise lawful action, nor was it the result of oversight, neglect or ignorance. It was purposely, deliberately unlawful. I had supposed our circuit had clearly and properly made that distinction in *United States v. Luna, supra,* where we dealt at some length with the effect of false information incorporated in an affidavit for a search warrant. There we observed:

> Nonetheless, it must be recognized that law enforcement agents presenting evidence to magistrates could make a mockery of the magistrate's role if, in the necessarily ex parte proceeding, they could freely employ false allegations in order to secure the warrant. The same could likewise be true if the agents could, with impunity, draft affidavits with utter recklessness as to truth or falsity. In either instance there would be a lack of good faith in the performance of the agent's duty to the judicial officer.
>
> There are two circumstances which we believe authorize the impeachment of an affidavit which on its face is sufficient probable cause for issuance of the warrant. The first of these consists of knowing use of a false statement by the *affiant with intent to deceive the court. This is true even if the statement can be said to be immaterial to the issue of probable cause. In our judgment such perjury must lead to suppression of the evidence in order to prevent fraud upon the judicial process.*

525 F.2d at 8 (emphasis added). It is true that here the information is tainted not by its falsity but by the unlawfulness of its procurement. However, the conduct is no less fraudulent in its impact on the procedures for issuing search warrants. There is a technical distinction, to be sure, but there is no moral difference. Neither should there be a legal difference. *United States v. Luna* would call for complete suppression if Agent Seward had lied about the presence in the house of the tableting machine; the result here can only telegraph the message to law enforcement officers that it is safer to break into a man's home than to lie about it.

I am wholly in accord with our circuit's ruling that, absent arbitrariness, a magistrate's finding of probable cause is conclusive. *United States v. Giacalone,* 541 F.2d 508 (6th Cir. 1976). Likewise I enthusiastically agree that ". . . when a magistrate has found probable cause, the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner." *United States v. Ventresca,* 380 U.S. 102,

109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965). These are sound and useful rules, but it seems to me that their necessary corollary is that we can only accord this deference to the magistrate's determination if we protect the integrity of the process by which that determination is reached, especially when the magistrate cannot.

I respectfully suggest that suppression here is supported not by any new extension of the law but is called for by the most ordinary application of existing principles and case law. We need not even concern ourselves with whether to extend the rule in *Luna,* because the information here was unquestionably material to the issue of probable cause. Contrary to the majority, I would hold that the standards in both *Langley* and *Nelson* compel reversal.

The motive of Agent Seward in persuading Bert to break and enter Thomas Flowers' home is clear. He stated, "I have got to know if that tablet-making machine is still at the Blair residence." The overwhelming evidence points to the tablet-making machine as being not only the primary object of the entire search but essential to show the entire nature of the operations being carried on at North Blair Street. Its presence there had not been observed since "the fall of 1972," at least fifteen months before the April 6, 1974 break-in, although as late as December, 1973 persons were observed carrying plastic bags of tablets out of the house. Seward's desperation is apparent from the quoted testimony and shows that without it, he was either not satisfied himself that there was probable cause or, more likely, concluded that without it he had insufficient evidence to convince the magistrate to issue the warrant. His own conduct and resort to such drastic steps is compelling proof that the evidence sought was anything but trivial, minor, or merely cumulative. On the contrary, it was the only solid, contemporary evidence he was able to produce for the magistrate concerning the North Blair Street house. The remainder was ambiguous at best. There was evidence that the Kinde operation had been discontinued in February, 1974. Richard and Thomas Flowers were brothers.

Without the known presence of the machine in April, 1974, the presence of their cars at Blair Street was hardly exceptional, and the carrying of packages in and out of the Blair Street house was innocuous.

This being a purely federal case, we could well rest suppression upon the supervisory powers of the court and upon our "duty of establishing and maintaining civilized standards of procedure and evidence," *McNabb, supra,* 318 U.S. at 340, 63 S.Ct. at 613. I view the conduct here, however, as so fundamentally unfair and corrosive of Thomas' rights as to rise to constitutional proportions. To violate the Fourth Amendment solely to comply with its requirements not only mocks that great protector of human freedom, but the employment of the fruits of that unlawful conduct impugns fundamental fairness and Thomas' right to due process under the Fifth Amendment.

I would reverse the conviction of Thomas Flowers and remand for a new trial of the charges against him. I concur in the majority opinion in all other respects.