865 F.2d 261
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
James Lee EVANS (87-5894), Al Isley (87-6117/88-5596), John
Wesley Finn (87-6118/88-5610), Defendants-Appellants.
 Nos. 87-5894, 87-6117, 87-6118, 88-5596 and 88-5610.
 United States Court of Appeals, Sixth Circuit.
 Dec. 12, 1988.
 
 Before DAVID A. NELSON and BOGGS, Circuit Judges, and GEORGE CLIFTON EDWARDS, Jr., Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 A federal district court jury convicted James Evans, Al Isley, and John Finn of conspiracy to import and distribute controlled substances. Mr. Evans was also convicted of possession with intent to distribute marijuana, and Mr. Finn was convicted of importation of marijuana and possession with intent to distribute cocaine. The defendants raise a number of issues on appeal, the principal one being that the evidence proved multiple conspiracies rather than the single conspiracy charged in the indictment. Finding none of the defendants' arguments persuasive, we shall affirm the convictions.
 
 
 2
 The criminal activities underlying the indictment began in January of 1978 and concluded with the arrest of Randall Garrett in October of 1985. Mr. Garrett was the key conspirator and the prosecution's key witness at trial. In 1979 and 1980 Mr. Garrett drove 25-, 50-, and 100-pound loads of marijuana from Florida to Louisville. The marijuana would be stored in Louisville, normally in a garage belonging to Mr. Finn, and various distributors would obtain it there.
 
 
 3
 Mr. Garrett soon decided to begin importing marijuana from outside the country. After lining up an airplane and pilots and locating a source of marijuana in Jamaica, Mr. Garrett imported his first load of marijuana in September of 1980. Four trips to Jamaica occurred during 1980, and 3600 pounds of marijuana were successfully imported. Mr. Finn helped bankroll the operation and accompanied Mr. Garrett to Jamaica and participated in the negotiations for the purchases there. In return for his help Mr. Finn received a portion of the marijuana at wholesale prices.
 
 
 4
 In 1981 two attempts were made to import marijuana from Jamaica. The first was successful, resulting in the importation of 1,200 pounds of marijuana. John Finn participated in the planning of the trip and in the off-loading and distribution of the cargo. The second attempt, which occurred a week later, ended in tragedy when the plane crashed on takeoff, killing two pilots. No more drugs were imported for the next 14 or 15 months, but shortly after the crash Mr. Garrett spent a month in Ecuador with a view to looking for a new source of marijuana there.
 
 
 5
 In the summer of 1982 Mr. Garett began attempting to purchase another plane for use in importing marijuana. At about the same time he obtained three kilograms of cocaine; of this amount, three pounds went to Mr. Finn.
 
 
 6
 Mr. Garrett suffered several setbacks in the ensuing months. First, he and Mr. Finn were arrested in Jamaica and accused of smuggling guns. Then in February or March of 1983 Mr. Garrett was in an airplane that crashed in Jamaica. While recuperating from injuries sustained in the crash, Mr. Garrett contacted appellant James Evans; Mr. Evans lent him $12,000 so he could return to the United States.
 
 
 7
 After the 1983 crash, Mr. Garrett turned to domestic marijuana cultivation. He was arrested for this activity in August, and served 60 days in jail. In late 1983 or early 1984 he began looking for a source of marijuana in Belize and a pilot and plane. In early 1984 Mr. Garrett oversaw the importation of 800 pounds of marijuana from Belize. After that successful trip, he arranged to purchase an airplane through James Evans. Although Mr. Evans' brother John was the record owner of the plane, Mr. Garrett made payment to James Evans. In cash.
 
 
 8
 Although Mr. Garrett had intended to use the plane in importing marijuana, James Evans persuaded him not to do so because of fear that the airplane was being watched. The machine was traded for another plane, with the assistance of Alfred Isley.
 
 
 9
 Because the plane for which Mr. Garrett traded was not airworthy, he entered into an agreement to buy a plane from Mr. Isley. Mr. Garrett told Mr. Isley that he needed to have the plane equipped with long-range tanks so that he could import marijuana from Belize without refueling. Mr. Isley agreed to accept marijuana from the first successful trip in part payment for the plane.
 
 
 10
 James Evans provided Mr. Garrett the cash needed to pay for the first load of marijuana from Belize. In late spring or early summer of 1984 Mr. Garrett succeeded in importing a second shipment of marijuana from Belize. The plane suffered from fuel problems on the trip, however, and Mr. Isley made arrangements for the necessary repairs. The plane was subsequently seized by the United States, and Mr. Garrett then obtained another airplane. From June of 1984 until his arrest early in 1985, Mr. Garrett successfully imported more than three tons of marijuana from Belize.
 
 
 11
 Mr. Garrett was released after his 1985 arrest, following which he obtained a carload of marijuana from James Evans. The conspiracy ended in September of 1985, when Mr. Garrett was again arrested.
 
 
 12
 The defendants argue that the evidence shows three consecutive conspiracies rather than the single conspiracy charged in the indictment. According to the defendants, the fact that Mr. Garrett did not actually import and distribute marijuana from April of 1981 until the summer of 1982 and from March of 1983 until the end of that year, coupled with Mr. Garrett's admission that he intended to stop importing marijuana after each airplane crash, precludes the finding of a single conspiracy.
 
 
 13
 In order to prevail on this claim, the defendants must show (1) a variance between the indictment and the evidence and (2) that the variance affects at least one of their substantial rights. United States v. Kelley, 849 F.2d 999, 1002 (6th Cir.1988). Whether the evidence shows a single or multiple conspiracy is a question of fact to be resolved by a jury under proper instructions. United States v. Rios, 842 F.2d 868, 872 (6th Cir.1988); United States v. Grunsfeld, 558 F.2d 1231, 1238 (6th Cir.), cert. denied, 434 U.S. 872 (1977). In the case at bar the jury was properly instructed in this regard. On appeal, then, we are to resolve the issue by viewing the evidence in the light most favorable to the government. Kelley, 849 F.2d at 1002; Rios, 842 F.2d at 872; Grunsfeld, 558 F.2d at 1238. We are prohibited from rejecting the jury's finding of a single conspiracy if the evidence can reasonably be construed as supporting that finding. See United States v. Warner, 690 F.2d 545, 548 (6th Cir.1982).
 
 
 14
 It is well established that a hiatus between overt acts does not necessarily disprove the existence of a single conspiracy encompassing both acts. In United States v. Panebianco, 543 F.2d 447, 453 (1976), the Second Circuit concluded that it was "reasonable for the jury to conclude that [a conspirator's] operations both before and after his six-month vacation in 1970 were parts of the same continuous conspiracy. Hibernation for a few months does not necessarily signal the end of a criminal partnership." In United States v. Little, 753 F.2d 1420 (1984), similarly, the Ninth Circuit rejected the defendants' claim that a six-month hiatus terminated the conspiracy. The court said that "[a] conspiracy is presumed to continue until there is an affirmative evidence of abandonment, withdrawal, disavowal or defeat of the purposes of the conspiracy." Id. at 1448. Quoting United States v. Bloch, 696 F.2d 1213, 1215 (9th Cir.1982), the court also said that "[a] single overall agreement need not be manifested by continuous activity. There may be a suspension of activities which does not divide a single conspiracy into more than one.' " Id. The Tenth Circuit has said that "[w]hen conspiratorial activity takes place for some two months ... a hiatus of less than three months may support an inference of a breathing spell rather than a termination of the conspiracy." United States v. Smith, 833 F.2d 213, 221 (10th Cir.1987).
 
 
 15
 Although the 14- or 15-month hiatus in the case at bar exceeds the duration of those considered in the cited cases, we do not believe that its length precludes the jury from finding a single conspiracy.
 
 
 16
 "[W]here a conspiracy contemplates a continuity of purpose and a continued performance of acts, it is presumed to exist until there has been an affirmative showing that it has been terminated; and its members continue to be conspirators until there has been an affirmative showing that they have withdrawn."
 
 
 17
 United States v. Hamilton, 689 F.2d 1262, 1268 (6th Cir.1982), cert. denied, 459 U.S. 1117 (1983).
 
 
 18
 The conspiracy charged in the indictment had as its overall purpose the acquisition and distribution of marijuana. The continuation of the conspiracy is evidenced by the apparent continuity of purpose among the acts. Prior to the 1981-82 hiatus the conspirators obtained an aircraft, a pilot, and a foreign source of marijuana. During the hiatus Mr. Garrett went to Ecuador, where he considered looking for another source of marijuana. The jury could reasonably infer from Mr. Garrett's actions that the intent to smuggle marijuana did not end with the crash on April 10, 1981. The jury could likewise view the resumption of activities in the summer of 1982 as a continuation of the original conspiracy. The 1982 activities mirrored those that preceded the 1981 crash: Mr. Garrett and Mr. Finn, among others, obtained another airplane and a new pilot, as well as a new source of marijuana in Jamaica.
 
 
 19
 When these efforts culminated in a second plane crash in 1983, Mr. Garrett, instead of terminating the conspiracy, turned to the domestic cultivation of the drug. That also failed, and efforts to import marijuana resumed. Once again, the illegal activities involved obtaining an aircraft, a pilot, and a foreign source of marijuana. This time the foreign source was in Belize, but in all other respects the smuggling activities were the same as those that occurred prior to each crash. In short, there was no affirmative showing that the conspiracy was terminated after either of the crashes. And although Mr. Garrett contemporaneously announced his intent to cease marijuana importation, we cannot say that the jury was unreasonable in inferring from what he actually did that the conspiracy in fact continued. The absence of an affirmative showing of termination, coupled with the substantial similarity of activities at all times relevant to the indictment, leads us to conclude that it was within the province of the jury to find that a single conspiracy existed.
 
 
 20
 We have considered the other issues raised by the defendants on appeal and find them to be without merit. Accordingly, the convictions are AFFIRMED.