976 F.2d 734
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
George KATSAKIS (No. 90-1164); Brian Lee McLennan (No.
90-1327); and Jessie Kincaid (No. 90-2165),
Defendants-Appellants.
 Nos. 90-1164, 90-1327 and 90-2165.
 United States Court of Appeals, Sixth Circuit.
 Sept. 21, 1992.
 
 Before NATHANIEL R. JONES and RALPH B. GUY, Jr., Circuit Judges, and KRUPANSKY, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Defendants, George Katsakis, Brian Lee McLennan, and Jessie Kincaid, appeal their convictions and sentences on cocaine-related conspiracy charges. For the reasons that follow, we remand for resentencing of McLennan and order that the district court append a copy of its findings and determinations to Katsakis's presentence report. We affirm defendants' convictions and sentences in all other respects.
 
 
 2
 * The conspiracy upon which defendants' convictions are based grew out of a cocaine distribution enterprise based in Michigan and run by Arthur Abrams, who was also the prosecution's key witness at trial. In 1982, Abrams began to expand his marijuana distribution activities to include cocaine trafficking. According to the prosecution's theory of the case, Katsakis's primary role in the conspiracy was to arrange deliveries of cocaine from suppliers to Abrams, for which Katsakis received commissions. Kincaid acted as a lower-echelon distributor who obtained cocaine from Abrams for further distribution. McLennan served as a courier who, on several occasions, drove Abrams or other conspirators from Michigan to Florida and back to obtain kilogram quantities of cocaine.
 
 
 3
 At trial, Abrams testified that he initially supplied cocaine to Kincaid and codefendant Lawrence Genoa.[1] In early 1984, Genoa found a less expensive source of cocaine and, thereafter, stopped buying cocaine from Abrams. Genoa's new source proved so fruitful that, by the middle of 1984, Abrams began purchasing cocaine from Genoa. Abrams continued, however, to cultivate his own supply of cocaine.
 
 
 4
 When Genoa decided to withdraw from cocaine trafficking in October of 1984, he referred Abrams to two of his suppliers. Genoa later turned over his entire cocaine business to Abrams, loaned money to Abrams so that he could build up inventory, and put Abrams into contact with Katsakis.
 
 
 5
 Meanwhile, Abrams secured an independent cocaine source in Miami, Florida. Abrams hired McLennan to accompany him to Florida "as a driver and as security." J.A. at 191. Abrams testified that he paid McLennan $1500 in cash for his services on the first trip. McLennan made at least six more trips to Miami with Abrams or other conspirators to purchase cocaine. McLennan's compensation for his services was normally based upon the amount of cocaine that he drove back to Michigan.
 
 
 6
 Defendant Katsakis introduced Abrams to two additional sources of cocaine in Michigan, and Abrams ultimately bought at least twenty kilograms of cocaine from these suppliers. Katsakis received commissions for Abrams's purchases from these suppliers. Katsakis also received commissions for sales in 1986 and 1987 to a customer that Katsakis had referred to Abrams.
 
 
 7
 Throughout this period, Kincaid remained a consistent customer of Abrams. Kincaid normally purchased between two and four ounces of cocaine per week from Abrams, at a cost of between $2800 and $5600 per week. Dennis Daniewski, an acquaintance of Kincaid, testified at trial that he occasionally would give Kincaid money for cocaine, either for them to share or for Daniewski to acquire for his own personal use.
 
 
 8
 Sometime in 1987, law-enforcement officers infiltrated Abrams's distribution network. On December 9, 1987, police executed a search warrant at Abrams's house. The search yielded, among other items, approximately fifty grams of cocaine and Abrams's daily ledger with statements of the amounts of money that various customers owed him. According to Abrams's testimony at trial, the seized ledger indicated that Kincaid owed Abrams $8800 and that McLennan owed Abrams $5300.
 
 
 9
 After execution of the warrant, Abrams cooperated extensively with law-enforcement authorities and assisted them in the prosecution of his coconspirators. On January 20, 1989, a federal grand jury indicted a number of coconspirators in the Abrams distribution ring, including Katsakis, McLennan, and Kincaid. A superseding indictment was filed on April 14, 1989. Count one charged all three defendants with conspiracy to possess with intent to distribute and distribution of cocaine, in violation of 21 U.S.C. § 846 (1988). Counts seven and eight charged Katsakis with possession with intent to distribute cocaine, and aiding and abetting, in violation of 21 U.S.C. § 841(a)(1) (1988) and 18 U.S.C. § 2 (1988). Count fourteen charged McLennan with interstate travel in aid of racketeering, in violation of 18 U.S.C. § 1952 (1988) (current version at 18 U.S.C.A. § 1952 (West Supp.1992)).[2] The case proceeded to trial and lasted nineteen days. At the close of trial, the jury convicted all three defendants of count one. Katsakis, McLennan, and Kincaid were thereafter sentenced to prison terms of 108 months, 121 months, and 70 months, respectively.[3] Defendants then filed the present timely appeals.
 
 II
 
 10
 McLennan and Kincaid claim that the evidence offered at trial was insufficient to support their convictions. In reviewing a defendant's challenge to the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).
 
 
 11
 McLennan and Kincaid were convicted of engaging in a conspiracy to distribute cocaine in violation of 21 U.S.C. § 846. As this court has recently explained, "to sustain a conviction under section 846, the government must prove the existence of an agreement to violate the drug laws and that each conspirator knew of, intended to join, and participated in the conspiracy." United States v. Sanchez, 928 F.2d 1450, 1457 (6th Cir.1991). Proof of a formal agreement, however, is unnecessary, and "a tacit or material understanding among the parties is sufficient to show a conspiracy." United States v. Pearce, 912 F.2d 159, 161 (6th Cir.1990), cert. denied, 111 S.Ct. 978 (1991). Nonetheless, "mere association with conspirators is not enough to establish participation in a conspiracy." Id. at 162 (quoting United States v. Stanley, 765 F.2d 1224, 1243 (5th Cir.1985)).
 
 
 12
 Turning first to McLennan's claim, the evidence at trial indicated that, on at least six occasions, McLennan drove Abrams or other conspirators to Florida in order to purchase kilogram quantities of cocaine for transport back to Michigan. Although McLennan concedes having made these trips, he contends that the prosecution failed to prove that he was aware of their true purpose. McLennan rests this contention largely on Abrams's testimony that he sought to conceal the object of the trips from McLennan, and that he told McLennan that the excursions to Miami concerned his interest in purchasing a restaurant. McLennan notes that other witnesses corroborated Abrams's assertions in this respect and points out that his participation as a driver was relatively brief, lasting only from May to August of 1985.
 
 
 13
 At least two witness, however, seriously called into doubt the plausibility of McLennan's claim of ignorance. Stuart Pascul, one of Abrams's principal sources of cocaine in Miami, testified that McLennan told him, at their initial meeting, that his role was "protecting them [Abrams's wife and another conspirator] and the cocaine and driving them to and from Miami." J.A. at 773. Pascul also testified that, during one cocaine transaction, McLennan sat at a counter while Abrams's wife and another conspirator tested and purchased kilogram quantities of cocaine. Id. at 776. According to Pascul, although McLennan apparently tried not to pay attention to the drug deals, he "knew what was going on." Id. at 777. Pascul also testified that, on one occasion when he was able to procure only two kilograms instead of the four requested by Abrams, the following exchange took place:
 
 
 14
 At that point--I remember this--Brian [McLennan] stopped in his tracks and said--looked at me and said, What do you mean that you could only get two? I said, That's all I was able to get. He said, This is hardly worth my time for coming down here for two. I'm not paid by the trip. I'm paid by the kilo. He was real upset and started to become irate.
 
 
 15
 Id. at 783. David Brach, who accompanied McLennan to Miami on several occasions, also testified that he believed McLennan was aware of the purpose of the trips. Viewed in a light most favorable to the prosecution, we believe Pascul's and Brach's testimonies were sufficient to support McLennan's conviction.
 
 
 16
 Kincaid also challenges the sufficiency of the evidence underlying his conviction. As a threshold matter, although Kincaid moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(a) at the close of the prosecution's case, he failed to do so at the close of all of the evidence, even though he presented evidence in support of his defense. This court has consistently held that a defendant's "[f]ailure to renew a motion for judgment of acquittal at the close of all the evidence limits the reviewing court to examine for plain error or to determine whether a manifest miscarriage of justice has occurred." United States v. Rigsby, 943 F.2d 631, 644 (6th Cir.1991), cert. denied, 112 S.Ct. 1269 (1992); accord United States v. Williams, 940 F.2d 176, 180 (6th Cir.), cert. denied, 112 S.Ct. 666 (1991); United States v. Faymore, 736 F.2d 328, 334 (6th Cir.), cert. denied, 469 U.S. 868 (1984)).
 
 
 17
 Kincaid insists that the prosecution's evidence indicated only that he purchased cocaine, and that no evidence connected him to the conspiracy to distribute cocaine. As Kincaid correctly asserts, " '[m]ere knowledge, approval of or acquiescence in the object or the purpose of the conspiracy, without an intention and agreement to cooperate in the crime' is not sufficient to make one a conspirator." United States v. Williams, 503 F.2d 50, 54 (6th Cir.1974) (quoting Cleaver v. United States, 238 F.2d 766, 771 (10th Cir.1956)). In addition, proof of a mere buyer-seller relationship is insufficient to support a conviction for conspiracy to distribute an illegal substance. See United States v. Meyers, 646 F.2d 1142, 1145 (6th Cir.1981); United States v. Grunsfeld, 558 F.2d 1231, 1235 (6th Cir.1977) (per curiam), cert. denied, 434 U.S. 872 (1977) and 434 U.S. 1016 (1978).
 
 
 18
 Even under the "plain error" standard of review, Kincaid presents a strong claim. The vast majority of trial evidence indicated only that Kincaid regularly purchased two- to four-ounce quantities of cocaine from Abrams over a period of several months, at an average cost of approximately $2800 to $5600 per week. Were this the sole basis of the prosecution's case against Kincaid, we would hesitate to affirm his conviction. At trial, however, the prosecution also offered the testimony of Dennis Daniewski, an acquaintance of Kincaid. According to Daniewski, Kincaid first put him into contact with Abrams as a possible drug source. Daniewski also testified that he would occasionally "share" cocaine with Kincaid. J.A. at 689. When asked to clarify what he meant, Daniewski responded as follows: "For instance, I would be at his house and ask him if he had any [cocaine]. I'd give him some money so we could do some. On occasion I might take a half gram from him and leave with it." Id. Daniewski also testified that Kincaid had a secret compartment in his house where he stored a triple-beam scale. Although this evidence is far from overwhelming, we believe that a rational juror could conclude from this testimony that Kincaid bought cocaine from Abrams at least in part for further resale and, therefore, that he was a member of the cocaine-distribution conspiracy. Accordingly, we refuse to reverse Kincaid's conviction on the basis of insufficient evidence.
 
 III
 
 19
 Defendants Katsakis and Kincaid allege that the United States withheld evidence favorable to them in violation of Brady v. Maryland, 373 U.S. 83 (1963) and Giglio v. United States, 405 U.S. 150 (1972). Specifically, defendants assert that the prosecution failed to disclose that Abrams had an informal agreement with federal authorities immunizing him from federal prosecution in exchange for his testimony before a federal grand jury.
 
 
 20
 Prior to trial, the prosecution informed defendants that Abrams had negotiated a formal plea agreement with state authorities in exchange for his cooperation. The prosecution gave no indication, however, that Abrams had an agreement with federal authorities. After Abrams's direct examination, and after counsel for Katsakis completed cross-examination of Abrams, counsel for Genoa began his cross-examination of Abrams. During the course of this cross-examination, Abrams testified that he had a "verbal agreement" with federal authorities. J.A. at 326-27. At the ensuing voir dire, outside the presence of the jury, Abrams continued to insist that, although he had received nothing in writing, the prosecution had led him to believe prior to trial that he had been granted immunity from federal prosecution in exchange for his testimony before a federal grand jury. See id. at 329-37. The prosecution responded that, although it did not have an agreement separate from the state agreement, it was nevertheless "honoring the spirit" of the state agreement. Id. at 328. After defense counsel moved for a mistrial, the court denied the motion on the ground that, because Abrams was still on the stand, defendants would be given the opportunity to cross-examine Abrams about his understanding of the agreement. Following voir dire, defense counsel Halpern (who represented neither Katsakis nor Kincaid) continued to cross-examine Abrams in the presence of the jury about the alleged agreement. Counsel for Katsakis and Kincaid were also given the opportunity the next day to cross-examine Abrams on the purported agreement, but it appears from the record that neither attorney did so.
 
 
 21
 It is well established that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87. In Giglio, the Supreme Court held that Brady extended to evidence that a witness had an agreement with the prosecution that might be used for impeachment purposes to undermine the witness's credibility. 405 U.S. at 154-55.
 
 
 22
 In United States v. Bagley, 473 U.S. 667 (1985), the Court addressed the standard of materiality in determining whether a prosecutor's failure to disclose requested evidence is a basis for overturning a defendant's conviction:
 
 
 23
 [S]uppression of evidence amounts to a constitutional violation only if it deprives the defendant of a fair trial. Consistent with "our overriding concern with the justice of the finding of guilt," a constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial.
 
 
 24
 Id. at 678 (citation omitted) (quoting United States v. Agurs, 427 U.S. 97, 112 (1976)). In United States v. Presser, 844 F.2d 1275 (6th Cir.1988), this court held that Brady is not violated where material evidence is disclosed in time for its effective use at trial. Id. at 1283. The court reasoned as follows:
 
 
 25
 [S]o long as the defendant is given impeachment material, even exculpatory impeachment material, in time for use at trial, we fail to see how the Constitution is violated. Any prejudice the defendant may suffer as a result of disclosure of the impeachment evidence during trial can be eliminated by the trial court ordering a recess in the proceedings in order to allow the defendant time to examine the material and decide how to use it.
 
 
 26
 Id. at 1283-84 (footnote omitted). Because materiality under Brady presents a mixed question of law and fact, our standard of review is de novo. See United States v. Phillip, 948 F.2d 241, 250 (6th Cir.1991), cert. denied, 112 S.Ct. 1994 (1992).
 
 
 27
 We believe that defendants are correct in asserting that the prosecution erred in failing to disclose its agreement with Abrams, even if that agreement was nothing more than its informal, tacit agreement to honor the already existent state agreement. That said, we do not believe that Katsakis and Kincaid are entitled to a new trial. The existence of the federal agreement was exposed during cross-examination of Abrams on September 19th. Counsel for Katsakis and Kincaid were both given the opportunity to cross-examine Abrams regarding the existence and extent of the agreement on September 20th. Thus, this is not a case where defendants were denied the right to present vital impeachment evidence to the jury. Indeed, the fact that counsel were given a day to prepare this information for impeachment purposes makes defendants' claim of a due process violation particularly weak. Accordingly, we conclude that the prosecution's failure to disclose its agreement with Abrams did not deprive Katsakis or Kincaid of a fair trial.
 
 IV
 
 28
 Katsakis and McLennan next challenge two of the district court's evidentiary rulings. Katsakis contends that the court erred in admitting a daily ledger seized during the execution of a search warrant at Abrams's house. McLennan, for his part, claims that the court improperly admitted testimony concerning his purchases of cocaine from Abrams in 1987. This court reviews errors in the admission of evidence only to determine if a substantial right of the party was affected. Fed.R.Evid. 103. We consider each claim in turn.
 
 
 29
 * At trial, the prosecution offered into evidence a daily ledger, purportedly drafted by Abrams, on which Abrams claims to have kept track of his drug accounts. Katsakis challenges the admission of the ledger on three grounds.
 
 
 30
 First, Katsakis claims that the prosecution failed to authenticate the ledger. Federal Rule of Evidence 901 sets forth the requirements for authentication of evidence and states, in relevant part, that evidence may be authenticated through the testimony of a witness with knowledge "that a matter is what it is claimed to be." Fed.R.Evid. 901(b)(1). This court reviews challenges to authenticity to determine if the district court abused its discretion in admitting the evidence. United States v. Hatfield, 815 F.2d 1068, 1074 n. 4 (6th Cir.1987).
 
 
 31
 The ledger was initially introduced through Officer Dianne Byford, who served as the evidence officer in the search of Abrams's house. Abrams later identified the ledger and explained its meaning. Although Katsakis points out that Byford's testimony regarding her memory of the ledger's color conflicted with Abrams's testimony on this issue, Abrams expressly identified the ledger as the original document that he had prepared. This minor discrepancy in the witnesses' testimonies did not mandate the ledger's exclusion. Accordingly, we find no abuse of discretion.
 
 
 32
 Katsakis also challenges the admission of the ledger on the basis of its relevancy. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. We review such challenges for abuse of discretion. See United States v. Levy, 904 F.2d 1026, 1029 (6th Cir.1990), cert. denied, 111 S.Ct. 974 (1991).
 
 
 33
 To obtain a conviction on the conspiracy charge, the prosecution was required to show, inter alia, an agreement to violate the drug laws. United States v. Sanchez, 928 F.2d 1450, 1457 (6th Cir.1991). Abrams testified that the ledger was a daily record of his accounts receivable relevant to his cocaine dealings, as well as a production and appointment schedule. Thus, the ledger was clearly relevant to proving the existence of a conspiracy.
 
 
 34
 Finally, Katsakis argues that the ledger was inadmissible under Rule 403, which admonishes the court to exclude evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed.R.Evid. 403. We review a district court's decision to admit or exclude evidence under Rule 403 for abuse of discretion. Turner v. Allstate Ins. Co., 902 F.2d 1208, 1214 (6th Cir.1990).
 
 
 35
 The basis of Katsakis's Rule 403 argument is that, although the ledger contained initials matching his, it included no entries as to amounts next to the initials and, therefore, did not tend to connect him to the alleged drug transactions. We disagree. The absence of an amount next to the initials was open to numerous interpretations and could have been brought out during direct and cross-examination of Abrams. Katsakis was free to explore its allegedly tenuous connection to him before the jury during cross-examination. The simple fact that Katsakis's initials appeared on Abrams' ledger, purportedly used by Abrams to keep track of his drug accounts, was certainly suggestive of Katsakis's involvement in the conspiracy. In sum, the district court did not abuse its discretion in admitting the ledger.
 
 B
 
 36
 During the direct examination of Abrams, the prosecution confined its questions regarding McLennan to his activities during 1985, the only year in which McLennan was alleged to have served as a courier for the conspiracy. On cross-examination of Abrams, McLennan's counsel sought to elicit that McLennan was unaware that his services for Abrams had been for the transportation of cocaine. Before conducting redirect, the prosecution requested permission to inquire about McLennan's purchases of cocaine from Abrams in 1987. The prosecution reasoned that Abrams's testimony on this issue was probative because "at some point, [McLennan] learned that Art Abrams was involved in the distribution of cocaine, otherwise [McLennan] would not have bought from [Abrams]. It's a valid [inference] that knowledge came during his association with Abrams, which included these deliveries to Florida." J.A. at 394. The district court decided, over McLennan's objection, to admit the testimony, but admonished the jury that it was offered solely for the purpose of establishing McLennan's knowledge at the time of his involvement with the conspiracy.
 
 
 37
 McLennan argues that Abrams's testimony regarding his 1987 drug purchases should have been excluded under Federal Rule of Evidence 404(b), which provides that
 
 
 38
 [e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
 
 
 39
 Fed.R.Evid. 404(b). McLennan also seeks support in this court's decision in United States v. Bakke, 942 F.2d 977 (6th Cir.1991). In Bakke, the defendant was charged with participation in a drug-smuggling conspiracy from 1983 through 1987 Id. at 978. Over defendant's objection, the district court admitted evidence that the defendant was arrested in 1988 while transporting a large quantity of cash and various drugs. Id. at 979-80. This court concluded that the district court abused its discretion in admitting the evidence, reasoning that
 
 
 40
 [t]he fact that [defendant] was arrested in a distant state some six months after the end of the charged conspiracy and incriminated himself in a totally unrelated drug transaction only demonstrated that he was a drug dealer in 1988. It did not demonstrate or tend to show, as claimed by the government, that he must have "learned the ropes" of the marijuana trade by participating in the earlier ... conspiracy. Yet, this was the only basis upon which the government argued that the evidence was admissible. Any such conclusion would be mere speculation.
 
 
 41
 Id. at 983; see also United States v. Zelinka, 862 F.2d 92, 98-99 (6th Cir.1988) (holding that district court abused its discretion in admitting evidence of defendant's drug arrest seventeen months after the cessation of the charged conspiracy).
 
 
 42
 Although we consider this a close question, we conclude that the district court did not err in admitting evidence of McLennan's 1987 drug purchases. Abrams's testimony of the purchases made McLennan's claim of ignorance as to Abrams's illegal business dealings and McLennan's transportation of cocaine less probable. Thus, this evidence was admissible to establish knowledge, which is expressly provided for in Rule 404(b). Bakke and Zelinka are distinguishable on the grounds that the subsequent drug-related activities in those cases involved wholly unrelated conspiracies, and in that the charged conspiracies themselves (not just the defendants' involvements in them) ceased prior the subsequent drug-related activities. In this case, because the subsequent activities involved the same conspiracy, the evidence was probative and relevant to McLennan's claim of ignorance.
 
 
 43
 Even if we were to conclude that the district court erred in admitting the challenged evidence, given the testimony by other witnesses suggesting that McLennan had knowledge of the drugs at the time of his involvement in the conspiracy, as well as the district court's limiting instruction, we do not believe that admission of the evidence affected McLennan's substantial rights. See Fed.R.Evid. 103(a). In sum, we conclude that the district court did not err in admitting evidence of McLennan's 1987 drug purchases from Abrams.
 
 V
 
 44
 McLennan also claims that the district court erred in denying his motion for severance. The United States claims, and McLennan does not dispute, that McLennan failed to renew his motion for severance at the close of all of the evidence. In United States v. Swift, 809 F.2d 320 (6th Cir.1987), this court held that, "[a]s a prospective ruling affecting cases tried after January 1, 1987, we hold that a severance motion will be deemed waived if it is not renewed at the end of the evidence." Id. at 323. Trial in the instant case took place in September of 1989. Accordingly, McLennan has not preserved his severance claim for appeal.
 
 VI
 
 45
 McLennan next challenges his sentence imposed under the sentencing guidelines. McLennan contends that he was no longer a member of the conspiracy after mid-1985. Because the sentencing guidelines first came into effect on November 1, 1987, McLennan claims that their application to him violated the Ex Post Facto Clause of the Constitution. In reviewing the factual findings of a sentencing court under the sentencing guidelines, we accept the findings of fact unless they are clearly erroneous. 18 U.S.C. § 3742(e) (1988); United States v. Duque, 883 F.2d 43, 44-45 (6th Cir.1989).
 
 
 46
 In United States v. Walton, 908 F.2d 1289 (6th Cir.), cert. denied, 111 S.Ct. 273, 530, 532 (1990), this court considered an ex post facto challenge to the sentencing guidelines brought by conspirators who claimed that their involvement in the conspiracy ceased prior to the effective date of the guidelines. In rejecting their challenge, we stated that
 
 
 47
 [e]ven if these defendants did not participate in the conspiracy after the effective date of the guidelines, the size of the drug distribution conspiracy in this case made it foreseeable that the conspiracy would continue after the effective date. In order to escape liability for the acts committed after the effective date of the guidelines, the defendants must prove that they affirmatively withdrew from the conspiracy before the effective date.
 
 
 48
 Id. at 1300. Thus, if a conspirator should have reasonably foreseen that the conspiracy would continue beyond the effective date of the sentencing guidelines, no ex post facto problem arises unless the conspirator proves that he or she affirmatively withdrew from the conspiracy before the guidelines' effective date.[4]
 
 
 49
 In order to establish withdrawal from a conspiracy, "a defendant must show that he or she took affirmative action to defeat or disavow the purpose of the conspiracy." United States v. Lash, 937 F.2d 1077, 1083 (6th Cir.), cert. denied, 112 S.Ct. 397 (1991) and 112 S.Ct. 943 (1992). Mere cessation of activity is insufficient. Id. Moreover, even if a defendant affirmatively acts contrary to the conspiracy, withdrawal remains a question of fact if the defendant acquiesced in the conspiracy after the affirmative act. Id. at 1084.
 
 
 50
 In the instant case, Abrams offered uncontested testimony at trial that he asked McLennan to drive him to Florida after McLennan's involvement in 1985, and that McLennan consistently refused Abrams' offers. J.A. at 370. In addition, we have discovered no evidence in the record suggesting that McLennan sought actively to take part in the conspiracy after his involvement in 1985. For these reasons, we conclude that McLennan took affirmative action to disavow the purposes of the conspiracy prior to the effective date of the guidelines and accordingly, that the district court erred in applying the guidelines to him.
 
 
 51
 The United States counters that McLennan's drug purchases from Abrams in 1987 indicate that McLennan did not withdraw or, at a minimum, that the purchases present strong proof of continued acquiescence in the conspiracy.[5] We find this argument unpersuasive. While the purchases certainly confirm a buyer-seller relationship between McLennan and Abrams, we cannot say they are probative of McLennan's alleged acquiescence in or approval of the conspiracy.
 
 
 52
 Accordingly, we remand to the district court for resentencing. Because of our conclusion, we do not address McLennan's remaining challenge to his sentence.
 
 VII
 
 53
 Katsakis and Kincaid also challenge various aspects of their sentences imposed under the sentencing guidelines. Because each defendant challenges the district court's application of the guidelines to the undisputed facts of his case, our review is de novo. United States v. Edgecomb, 910 F.2d 1309, 1311 (6th Cir.1990). We consider defendants' claims seriatim.
 
 
 54
 * Kincaid challenges the district court's calculation of his criminal-history category; specifically, Kincaid claims that the court erred in considering a 1978 conviction for violating a city ordinance prohibiting the use of marijuana in calculating his criminal-history score.[6]
 
 
 55
 Resolution of this issue is guided by section 4A1.2 of the sentencing guidelines. Under the version of the sentencing guidelines in effect at the time Kincaid was sentenced, section 4A1.2(c)(1) provided, in relevant part, as follows:
 
 
 56
 Sentences for the following prior offenses and offenses similar to them, by whatever name they are known, are counted only if (A) the sentence was a term of probation of at least one year or a term of imprisonment of at least thirty days, or (B) the prior offense was similar to an instant offense....
 
 
 57
 United States Sentencing Commission, Guidelines Manual § 4A1.2(c)(1) (Nov. 1, 1989). Section 4A1.2(c)(1) lists "[l]ocal ordinance violations" as one of the offenses to which it applies. Id.
 
 
 58
 The United States does not contend that Kincaid's 1978 conviction resulted in a term of probation of at least one year or a term of imprisonment of at least thirty days. Accordingly, the conviction does not fall within the first prong of section 4A1.1(c)(1). Nonetheless, although the sentencing guidelines do not define the term "similar" as it is used in that section, the United States asserts, and we agree, that Kincaid's 1978 conviction for using marijuana was sufficiently similar to his present conviction for conspiracy to possess with intent to distribute cocaine to support the district court's decision to count the conviction under section 4A1.2(c) in calculating Kincaid's criminal-history score. Accordingly, we affirm Kincaid's sentence.
 
 B
 
 59
 Katsakis contends that the district court failed to attach its findings at sentencing to the presentence report made available to the Bureau of Prisons. Federal Rule of Criminal Procedure 32(c)(3)(D) provides that where the district court makes findings as to disputed facts at sentencing, "[a] written record of such findings and determinations shall be appended to and accompany any copy of the presentence investigation report thereafter made available to the Bureau of Prisons." Fed.R.Crim.P. 32(c)(3)(D). In its brief on appeal, the United States concedes that the district court erred in failing to append a copy of its findings and determinations to Katsakis's presentence report. Accordingly, we remand for the district court to append a copy of its findings to Katsakis's presentence report.
 
 VIII
 
 60
 For the foregoing reasons, we VACATE McLennan's sentence and REMAND for resentencing, REMAND for the district court to append a copy of its findings and determinations to Katsakis's presentence report, and AFFIRM defendants' convictions and sentences in all other repects.
 
 
 
 [1]
 Defendants in the present appeal were tried with Genoa, who was also convicted by jury verdict. Prior to sentencing, however, Genoa disappeared and, at the time of briefing in this appeal, remained at large
 
 
 [2]
 The remaining counts with which defendants were charged are not relevant to the present appeal
 
 
 [3]
 Katsakis also received a concurrent sentence of 108 months of imprisonment for his conviction on count eight, aiding and abetting the possession of cocaine with intent to distribute. Katsakis was found not guilty on count seven. Count fourteen, charging McLennan with interstate travel in aid of racketeering, was withdrawn prior to the jury's verdict
 
 
 [4]
 McLennan asks that this panel overrule our decision in Walton. That, however, is beyond the scope of authority. See United States v. Wolak, 923 F.2d 1193, 1199 (6th Cir.), cert. denied, 111 S.Ct. 2824 (1991)
 
 
 [5]
 McLennan contends that, because Abrams' testimony regarding his 1987 drug purchases was admitted solely for the purpose of showing knowledge of the drug conspiracy in 1985, it may not be used at sentencing to support a finding of continued acquiescence in the conspiracy. We disagree. Although the evidence was offered for a limited purpose at trial, the evidence was nevertheless properly considered at sentencing. See 18 U.S.C. § 3661 (1988) ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.")
 
 
 [6]
 Kincaid was also assessed one criminal-history point for a 1987 conviction for operating a vehicle under the influence of alcohol. Kincaid does not challenge this aspect of his criminal-history score on appeal