UNITED STATES of America

v.

CALISTO, Samuel J., Appellant.

No. 87–1096.

United States Court of Appeals,
Third Circuit.

Argued Sept. 9, 1987.

Decided Feb. 5, 1988.

Rehearing and Rehearing In Banc
Denied Feb. 29, 1988.

Gilbert J. Scutti (argued), Philadelphia, Pa., for appellant.

Edward S.G. Dennis, Jr., U.S. Atty., Walter S. Batty, Jr., Asst. U.S. Atty. Chief of Appeals, Ewald Zittlau (argued), Asst. U.S. Atty., Philadelphia, Pa., for appellee.

Before SLOVITER and STAPLETON, Circuit Judges, and FISHER, District Judge.[*]

**OPINION OF THE COURT**

STAPLETON, Circuit Judge:

Appellant, Samuel Calisto, was charged with possession with intent to distribute methamphetamine, in violation of 21 U.S.C. § 841(a)(1) (1982), and with receipt and possession of firearms after having been convicted of a felony, in violation of 18 U.S.C. §§ 922(h)(1) and 1202(a)(1) (Appendix) (1982 & 1987 Supp.). He was convicted on all

---

* Honorable Clarkson S. Fisher, United States District Judge for the District of New Jersey, sitting   by designation.

three counts at a bench trial. Calisto's convictions rest on physical evidence seized during a search of his home pursuant to a warrant and on one of two incriminating statements he made during that search. Calisto attempted, without success, to have the physical evidence and the statement suppressed. In this appeal, he argues that the denial of his motion to suppress was reversible error. We will affirm the judgment of the district court.

## I.

On the evening of July 4, 1986, Detective Vivino, a Philadelphia police officer participating in an investigation of a man by the name of Frank Aiello, received a telephone call at home from an informant who told Vivino that Aiello had given a suitcase containing a number of pounds of methamphetamine to Calisto for safekeeping at Calisto's residence. The informant also provided some information about when and where this transaction had taken place. Later that evening, Vivino called Agent Dougherty, a Pennsylvania Crime Commission officer with whom Vivino had worked in the past and who was also involved in the Aiello investigation, and passed this information along to him. Vivino's reason for relaying the information to Dougherty in this way was his belief that it would aid Dougherty in his investigation of Aiello. In order to protect his informant from retaliation by those involved in the drug dealing, Vivino requested that Dougherty not reveal that Vivino was the source of the information; Vivino believed that if he were identified, his informant could be as well. Dougherty asked Vivino if the informant was reliable, and was assured that this was the case. Vivino testified at the suppression hearing that his belief in the truthfulness of the information secured from his source was based on several past contacts in which information supplied by the informant had proved to be reliable.

On the following Monday, July 7, 1986, Agent Dougherty shared the information about Calisto with Agent Gilbride of the Drug Enforcement Agency, with whom Dougherty was working on the Aiello investigation. Dougherty asked Gilbride to preserve the anonymity of the Pennsylvania Crime Commission in using the information in order to prevent news of the Commission's interest in Aiello from leaking out. Gilbride inquired of Dougherty whether the source of the information could be relied on, and Dougherty told Gilbride that the source was indeed reliable. Gilbride was not aware at that time that Dougherty's immediate source was another law enforcement officer, and Gilbride did not ask who the source was.

Later that day, Agent Gilbride called Pennsylvania State Trooper Weniger, with whom he had worked in the past, and informed him of the reported Aiello–Calisto transaction. Gilbride told Weniger that the information came from a "confidential source", and that this source had given Gilbride true and reliable drug information in the past. In making these statements, Gilbride was attempting to keep secret the involvement of the Pennsylvania Crime Commission in the investigation of Aiello, as he had been requested to do by Agent Dougherty. Gilbride also informed Weniger that Aiello was entered into the DEA's Narcotic and Dangerous Drug Information System, NADDIS, as a methamphetamine manufacturer.

Weniger proceeded to look up the addresses and arrest records of both Aiello and Calisto, and found that Aiello had a non-drug arrest in 1982 while Calisto apparently had a clean record. Calisto's prior felony conviction, and thus his criminal liability under 18 U.S.C. §§ 922(h)(1) and 1202(a)(1) (App.), did not come to light until after his arrest. Weniger also contacted Corporal Marinetti, a member of one of the regional narcotics forces of the state police, who told Weniger that his office had received information that Aiello was involved in trafficking and manufacturing methamphetamine. Weniger then called Gilbride back to ask how Gilbride knew the methamphetamine was at Calisto's residence. Gilbride called Dougherty, who called Vivino, who asked his informant; word filtered back to Gilbride that the informant had seen the methamphetamine there. The next day, July 8, 1986, Gilbride reported

this to Weniger, who went to a state court bail commissioner to request a search warrant for Calisto's residence.

Thus, the information provided by the original confidential source went to Vivino, to Dougherty, to Gilbride, to Weniger, and ultimately, to the magistrate.

In support of his request for a warrant, Weniger swore to an affidavit which included the following paragraphs, challenged by Calisto as deceptive:

2. On 7 July 86, the affiant received information from Special Agent John GILBRIDE, of DEA–Philadelphia Office, that a Samuel J. CALISTO ... and a Frank A. AIELLO Jr. ... are involved in trafficking narcotics, namely methamphetamine. SA GILBRIDE related that he learned through a confidential source that on 4 July 86, the subject AIELLO gave the subject CALISTO a package that contained between 5 and 10 pounds of methamphetamine. This transaction took place above the GOOD, the BAD & the UGLY BAR, located in South Philadelphia, during the evening hours. CALISTO then took the methamphetamine and placed it in his residence located at 821 Watkins Street, Phila., Penna.

3. On 7 July 86, SA GILBRIDE related to the affiant that his confidential source has provided him with drug information in the past and has proved this information to be true and reliable. SA GILBRIDE has received information from this source on several occasions in the past and on each occasion the source's information has been checked and verified. On every occasion the information was found to be true and correct. SA GILBRIDE feels without a doubt that all information supplied by the source is true.

6. On 8 July 86, the affiant again received information from Special Agent GILBRIDE concerning the activities of CALISTO and AIELLO. SA GILBRIDE related to the affiant that his source advised him, that between 4 July 86 and 6 July 86 the methamphetamine was observed in CALISTO's residence.

Weniger also included in the affidavit Gilbride's statement to him that Aiello was entered in NADDIS as a methamphetamine manufacturer, information about his own efforts to check up on the information provided by Gilbride, and a statement that he knew from experience that traffickers use individuals without criminal records to hold drugs for them.

Calisto's home was searched by a group of law enforcement officers which included members of the Philadelphia Police Department, the Pennsylvania State Police, and the DEA. Weniger read Calisto his rights at the outset of the search, and Calisto chose to remain silent. In the course of the search, Philadelphia Police Officer Shiver found a suitcase of methamphetamine in a second-floor bedroom. He called this information down to Officer McKeefry, also of the Philadelphia Police Department, who arrested Calisto and began rereading him his rights. Shiver meanwhile returned to the second floor, looked around for another half a minute, and came downstairs. He waited until McKeefry had finished, then said to McKeefry that he had found both men's and women's clothing in the bedroom where the methamphetamine had been located. McKeefry responded "Well, then we'll have to get an arrest warrant for the daughter." McKeefry testified that he said this very softly, in "almost a whisper", or at least in a "low-tone voice". Calisto, who had just repeated to McKeefry his wish to remain silent, was sitting nearby; he said "Don't lock my daughter up. She has nothing to do with that stuff. That's mine. I'm the one you want." Calisto later made a second, more incriminating, statement in response to a direct threat to proceed against his daughter.

The police found two guns, both admitted into evidence, in the same bedroom as the drugs. Another gun, ultimately not presented as evidence, was found in an adjacent bedroom together with a large amount of cash. All of the guns, and the cash, were confiscated.

Calisto moved to suppress the drugs, guns, and statements. After a suppression hearing, his motion was denied as to all

evidence but the second statement. At the hearing, the trial judge found the following: that Weniger believed in the truth of his affidavit; that the affidavit was, read literally, accurate; that there had been no effort to deceive the bail commissioner;[1] that there was no evidence that the bail commissioner was deceived by the affidavit; that the omitted information was not crucial to the existence of probable cause to issue a warrant; that the guns were properly seized as items used in drug distribution; and that the first incriminating statement was admissible because it was not a product of custodial interrogation.

## II.

Calisto's challenge to the validity of the search is based on *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Under *Franks*, if a defendant makes a substantial preliminary showing that 1) a false statement was included by the affiant in an affidavit supporting a search warrant, either knowingly and intentionally or with reckless disregard for the truth and 2) the allegedly false statement is necessary to a finding of probable cause, then the false material in the affidavit is to be set aside and the sufficiency of the affidavit to establish probable cause is to be judged by the remaining material. Calisto argues that the Weniger affidavit was knowingly and intentionally false or made with reckless disregard for the truth and that, accordingly, there must be a *Franks*-type excision of paragraphs 2, 3

and 6 of Weniger's affidavit. When those paragraphs have been excluded, Calisto contends, the affidavit provides no probable cause for the issuance of a search warrant.

We start with the fact that from Weniger's perspective, the affidavit was filed in good faith and accurately reflected the facts as he understood them. We agree with Calisto, however, that this cannot end the matter. If we held that the conduct of Weniger, as the affiant, was the only relevant conduct for the purpose of applying the teachings of *Franks*, we would place the privacy rights protected by that case in serious jeopardy. As the Supreme Court noted in *Franks*, "police [can]not insulate one officer's deliberate misstatement merely by relaying it through an officer-affiant personally ignorant of its falsity." 438 U.S. at 164 n. 6, 98 S.Ct. at 2680.[2]

We also agree with Calisto that his argument is not answered by the fact that the Weniger affidavit is literally true because Gilbride's immediate source was reliable and was believed by Gilbride to be reliable based on several past experiences. If Calisto is correct in his contention that the affidavit is materially misleading, it would make no difference that it could be read literally to correspond with reality. We conclude, however, that *Franks* does not require a reversal of Calisto's conviction.

The record reflects that the portion of Weniger's affidavit which refers to Gilbride's source accurately describes the

---

**1.** The trial judge's view of the failure to disclose the true state of facts to the issuing authority was as follows:

He [the issuing authority] has the right to ask. He, indeed, may not be precluded from the information if he requests it, but I know of no case that says there is a requirement that the layers of information from whom the informant received his information must be revealed under the standard of *Illinois v. Gates* to the issuing authority.

App. at 285.

**2.** This is not a case where a law enforcement affiant has provided in good faith information that has allegedly been supplied to him in bad faith by a citizen informant. In such cases, the courts have uniformly sustained the validity of the warrant. *See, e.g., United States v. Mc-*

*Donald*, 723 F.2d 1288, 1293 (7th Cir.1983), *cert. denied* 466 U.S. 977, 104 S.Ct. 2360, 80 L.Ed.2d 831 (1984); *United States v. Southard*, 700 F.2d 1, 10 (1st Cir.1983), *cert. denied sub nom. Ferris v. United States*, 464 U.S. 823, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983); *United States v. Schauble*, 647 F.2d 113, 117 (10th Cir.1981); *United States v. Luschen*, 614 F.2d 1164, 1172 (8th Cir.1980), *cert. denied sub nom. King v. United States*, 446 U.S. 939, 100 S.Ct. 2161, 64 L.Ed.2d 793 (1980). Here, the alleged bad faith is that of law enforcement personnel. *See United States v. Pritchard*, 745 F.2d 1112, 1118 (7th Cir.1984); *United States v. Dorfman*, 542 F.Supp. 345 (N.D. Ill.1982), *aff'd sub nom. United States v. Williams*, 737 F.2d 594 (7th Cir.1984), *cert. denied* 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985).

original source of the hearsay information concerning Calisto, namely Vivino's confidential informant. The original source of the information was correctly represented to be a confidential source who was reliable and who was believed by his law enforcement contact to be reliable based on several experiences in the past when the information provided had been subsequently confirmed. Accordingly, assuming, as Calisto argues, that the Weniger affidavit suggests to the magistrate that Gilbride described to Weniger the *original* source of the hearsay information, the magistrate could not have been misled about that *original* source. If the magistrate read the affidavit as Calisto would have us read it, he may well have gotten the misimpression that Gilbride secured the information directly from the original confidential informant source, rather than third-hand through two other law enforcement officers, but he could not have been misled about the fact that the original source was a confidential informant or about the indicia of his or her reliability.

Moreover, the fact that the affidavit accurately described the original source of the information was not wholly fortuitous. Each of the officers in turn asked about the reliability of their immediate source's source and each officer had the reliability of what he believed to be the original source confirmed. Thus, while Gilbride, in an effort to conceal the involvement of the Pennsylvania Crime Commission, intentionally deleted from his report to Weniger the fact that his immediate source was Dougherty, Gilbride had no intention of misleading the magistrate with respect to the original source of the information and, indeed, had every reason to believe that the magistrate would receive an accurate description of that original source. Similarly, Dougherty's efforts to protect Vivino's original informant from retaliation did not stem from any intent to mislead the magistrate.

Thus, we are confronted with a situation in which the magistrate may have been intentionally misled into believing that the story of the original confidential source was transmitted to Weniger through only one law enforcement officer rather than three. Moreover, it is a situation in which any intent on Gilbride's or Dougherty's part to mislead the magistrate was occasioned not by a scheme to deceive the magistrate about a material fact, but by a desire to withhold a fact not material to the magistrate's task. We believe this is what the trial judge meant when he found both that Gilbride and Dougherty intended to conceal the participation of Vivino and of the Pennsylvania Crime Commission but that there had been no effort to deceive the magistrate. Thus, while we agree with Calisto that paragraphs 2, 3, and 6 may have been intentionally misleading, the deficiency is far less serious than Calisto maintains both in terms of the potential of those paragraphs for skewing the fact-finding process and in terms of the subjective intentions of the officers involved.

In Calisto's view, *Franks* requires that any intentionally misleading portions of an affidavit be stricken and that the existence of probable cause be determined by reference solely to the redacted document. By physically striking paragraphs 2, 3, and 6 in accordance with this rationale, Calisto is able to conclude that the affidavit provides no indicia of the reliability of the confidential source and, indeed, very little inculpating information. Accordingly, Calisto contends that the affidavit did not provide probable cause. We conclude that *Franks* does not require such a mechanistic application of its teachings.

The redaction process described in *Franks* was a vehicle for determining whether there was a causal connection between the alleged misrepresentation in that case and the challenged search. If the information in the affidavit without the misrepresentation provided probable cause and the warrant should thus have been issued even had there been no scheme to deceive, there would be no causal connection between the scheme and the search and the search would not be tainted. When this rationale behind the redaction process is understood, *Franks* supports the government's position in this case rather than the position of Calisto.

As we have noted, the only misleading aspect of Weniger's affidavit was that he unwittingly omitted the fact that the information concerning Calisto passed through the hands of two additional police officers, Vivino and Dougherty. In the absence of Gilbride's effort to conceal the participation of the Pennsylvania Crime Commission, and Vivino's effort to protect the original informant, Weniger's affidavit would have been exactly the same as it was except that the role of Vivino and Dougherty as relayers of the information would have been disclosed. If that disclosure had been made, we think it clear that the affidavit would still have provided probable cause for the issuance of the warrant. Accordingly, we conclude that there was no causal connection between Gilbride's and Dougherty's deception and the challenged search and that the search must be upheld.

Because the only intent to mislead reflected in this record is the intent to conceal the participation of two law enforcement officers as relayers of information from a confidential source, a fact unimportant in the context of probable cause, and because the warrant would have properly been issued if the omitted information had been supplied, we reject Calisto's argument that *Franks* requires suppression of the fruits of the challenged search.

### III.

■ Calisto next argues that the firearms were seized improperly because they were not within the scope of the search warrant and because at the time of the seizure, the police were not aware that Calisto had a prior felony conviction which would render his possession of the firearms illegal.

The warrant authorized the seizure of "items used in the manufacture, sale, use, etc. of controlled substances". It is well established that firearms may be considered items used in connection with controlled substances. In *United States v. Picklesimer*, 585 F.2d 1199, 1204 (3d Cir. 1978), for example, in holding that weapons found in a defendant's possession may be relevant and admissible evidence in connec-

tion with a narcotics conspiracy charge, we said that "a weapon may be as much a tool of the crime as the van used to transport the narcotics." In *United States v. Gorecki*, 813 F.2d 40, 43 (3d Cir.1987), joinder of weapons and drug charges was permitted on the ground that the drugs and weapons were "sufficiently connected temporally and logically to support the conclusion that the two crimes [were] part of the same transaction or plan." In this case, we agree with the trial court that the connection between the guns and drugs was close enough to justify seizure of the guns under the warrant. Given this conclusion, whether or not the police knew of Calisto's prior record at the time the guns were seized is irrelevant.

### IV.

Finally, Calisto makes two arguments for excluding the incriminating statement. The first, that it is the fruit of an illegal search, is without merit in light of our finding that the search warrant was valid. The second, that it is the result of custodial interrogation and thus inadmissible, also proves groundless.

Under the prophylactic rules announced in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), a statement made by a suspect in response to custodial interrogation after he or she has elected to remain silent is inadmissible at trial. As the Supreme Court held in *Rhode Island v. Innis*, 446 U.S. 291, 300–01, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980), this rule comes "into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Police may not, however, "be held accountable for the unforeseeable results of their words or actions", *id.* at 302, 100 S.Ct. at 1690, and to constitute interrogation for this purpose,

their conduct "must reflect a measure of compulsion above and beyond that inherent in custody itself." *Id.* at 300, 100 S.Ct. at 1689.

In the *Innis* case, Innis was arrested, unarmed, following the robbery of a taxi-cab driver by a man wielding a sawed-off shotgun. He was placed in a police car with three officers to be transported to the police station. A conversation among the officers ensued during which one of them noted that there was a school for handicapped children located nearby and said "God forbid [that] one of them might find a weapon with shells and ... might hurt themselves." *Id.* at 294–95, 100 S.Ct. at 1686. Another officer concurred, stating that "it would be too bad if [a] little ... girl ... would pick up the gun [and] maybe kill herself." *Id.* at 295, 100 S.Ct. at 1687. Innis then interrupted the conversation, stating that he would show the officers where the gun was located. This statement was admitted against Innis at trial, and the Supreme Court of Rhode Island reversed his conviction for that reason. In its view, "even though the police officers may have been genuinely concerned about the public safety and even though [Innis] had not been addressed personally by the police officers, [he] nonetheless had been subjected to 'subtle coercion' that was the equivalent of 'interrogation' within the meaning of the *Miranda* opinion." *Id.* at 296, 100 S.Ct. at 1687.

The Supreme Court reversed, holding that the presence of "subtle coercion" does not require suppression unless "a suspect's incriminating response was the product of words or actions on the part of the police that they should have known were reasonably likely to elicit an incriminating response." *Id.* at 303, 100 S.Ct. at 1691. In concluding that *Innis* was not such a case, the Court noted that the officers' remarks were not addressed to Innis, that they were the kind of remarks law enforcement personnel would normally make to one another in a situation of this kind, that the "entire conversation" consisted not of a "lengthy harangue," but "of no more than a few offhand remarks," that nothing suggested the officers were aware that Innis was

"peculiarly susceptible to an appeal to his conscience concerning the safety of handicapped children," *id.* at 302, 100 S.Ct. at 1690, and that Innis did not appear to be disoriented or upset at the time of his arrest.

■■■ In Calisto's case, the trial judge made the following oral findings at the close of the suppression hearing:

> ... I find that the statement by Mr. Calisto was not coerced involuntarily and that it was not in violation of his Miranda rights; that it was a blurt-out by Mr. Calisto, not in response to any interrogation by the police, but a blurt-out obviously designed to save his daughter from involvement in the transaction. I know of no case that prevents a person after being warned of his rights from voluntarily making a disclosure for any purposes that a person wishes to make a disclosure ....

App. at 322. In context, we read the trial judge's finding that Calisto's statement was a "blurt-out" not made "in response to any interrogation by the police" as a determination that Calisto's statement was not a reasonably foreseeable consequence of the conversation between the two police officers.

While we have not ruled on the issue before, we now conclude that the issue of whether custodial police interrogation has taken place in a given case "is a hybrid question of law and fact subsuming a complex of values, and as such cannot be treated as a simple question of historical fact." *United States v. Fraction,* 795 F.2d 12, 14 (3d Cir.1986) (commenting on the standard of review on a question of the voluntariness of a statement). We are, of course, bound to accept the district court's findings of primary historic fact unless they are clearly erroneous. We exercise plenary review, however, with respect to the district court's determination as to whether the police conduct found to have occurred constitutes custodial interrogation under all the circumstances of the case. We so hold because that "determination requires us to 'consider legal concepts in the mix of fact

and law and to exercise judgment about the values' underlying the *Miranda* rule and the fifth amendment." *United States v. Poole*, 794 F.2d 462, 465 (9th Cir.1986) (plenary review appropriate for the "custodial interrogation" issue); *see also United States v. Disla*, 805 F.2d 1340, 1347 (9th Cir.1986) (same).[3]

We view this case as very close to the *Innis* case and reach the same conclusion. McKeefry's remark regarding the possible arrest of Calisto's daughter was not directed to Calisto, was the kind of remark that an officer would normally make in carrying out his duties under the circumstances that confronted him, and was not made in a provocative manner. Moreover, it was a single isolated remark made in the presence of a suspect who showed no signs of being emotionally upset or overwrought. Finally, even if it could be said that reasonable officers might have expected a protest of some kind from Calisto upon his hearing of his daughter's possible arrest, we do not think it was reasonable to expect an inculpatory response from Calisto.

## V.

For the foregoing reasons, the judgment of the district court will be affirmed.

---

**3.** In so holding, we follow the approach suggested by Judge Adams in his concurrence in *United States v. Mesa*, 638 F.2d 582, 591 n. 3 (3d Cir. 1980):

"Custodial interrogation" is a legal term of art central to *Miranda* jurisprudence, and a decision whether or not "custodial interrogation" occurred is a matter of law to be determined in accordance with the policies underlying the *Miranda* rule. The legal nature of the determination is evidenced by the numerous Supreme Court decisions deciding whether certain facts constitute "custody" or "interroga-

tion." *See, e.g., Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); *Orozco v. Texas*, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969). Accordingly, an appellate court is free to re-examine the trial court's legal conclusion as to the applicability of the *Miranda* rule. The standard of appellate review does not change simply because the legal determination in a *Miranda* situation depends on the particular facts of each case.