UNITED STATES of America,
Plaintiff,

v.

Ricardo **DELGADO**, II, Defendant.

No. 99–CR–20082.

United States District Court,
E.D. Michigan,
Northern Division.

Nov. 17, 2000.

Michael J. Hluchaniuk, U.S. Attorney's Office, Bay City, MI, for U.S.

Rodney J. O'Farrell, O'Farrell, Smith, Saginaw, MI, for defendant.

## OPINION AND ORDER GRANTING DEFENDANT'S MOTIONS TO SUPPRESS EVIDENCE

LAWSON, District Judge.

The Court in this case is called upon to assess the validity of a search of a home and seizure of property made pursuant to a search warrant issued on the basis of an affidavit which contained erroneous information as to the address of the residence to be searched, the defendant's criminal record and the owner of the premises, and false information that an informant had seen controlled substances at the premises.

### I.

The defendant, Ricardo Delgado, II, is charged in six counts of a thirteen-count superseding indictment with various controlled substance and weapons offenses. The charges arose from an investigation that began in the Fall of 1999 by FBI agents and officers with the Bay Area Narcotics Enforcement Team (BAYAN-ET) into the alleged drug trafficking activities of the defendant and others. As part of the investigation, Saginaw County Sheriff Deputy Gerald Fish interviewed a confidential informant identified as FBI–2. The interview took place in a police vehicle in October, 1999. During the interview, Deputy Fish inquired about the drug trafficking activity of Delgado and one Aristeo Robelin. The interview was tape-recorded. According to the transcript of the interview, FBI–2 (identified as "CS") told Deputy Fish:

Fish: Who else was there? What about the man from the, on Lapeer? What was the name, uh?

CS: Delgado.

Fish: Delgado, yeah.

CS: Thats [sic] the, I know they (unintelligible) I know they bring a lot of keys in.

Fish: Okay.

CS: And they get 'em from Texas. I know that, you know, 'cause when I was dealing with them (unintelligible) about this time last year, I bet when he storin' (unintelligible) Up until like April. It happened about April when I got (unintelligible) You know, they got mad if I knew how much (unintelligible)

Fish: Yeah.

CS: (unintelligible) I don't know, (unintelligible) mad for a minute, I didn't care, 'cause I was (unintelligible)

Fish: (Laughs)

CS: So, you know, ah, (Unintelligible) almost certain I know their names. Delgado, two, [sic] one of 'em drives a black Grand Am, two door, and one of 'em drive a four door Grand Am, about a ninety-eight, ninety-nine Grand Am, both of a black, though. And the, ah, (unintelligible) and, and one night. (unintelligible) came by my house with him one night. And they had dope both of them go around the corner and then go back to my house, come by my house. I don't let them keep the dope there, ah, (unintelligible) sometime, and I know that when they leave, (unintelligible) dope dealers to me, you know, they ain't, they be gone for about four or five days, and when they come back, (unintelligible) there was like ten keys at one time, and I was, shiit [sic], man, I am not (unintelligible) I don't know how they (unintelligible)

Fish: The, ah, when, where was you at when you saw the dope? At their house or . . .

CS: At their house.

Fish: Okay.

CS: On Ruckle.

Fish: Okay. Now, but, you, have you ever been on Lapeer Street?

CS: No, no, no.

Fish: Okay.

CS: No, I ain't never been over there.

Gov't Ex. 102, Hr'g on Mot. to Suppress.

Deputy Fish did not make a report of the interview. However, he took contemporaneous notes, and while FBI–2 was speaking Fish wrote, "Delgado's . . . mid 20's Lapeer St . . . saw 10 Kilos April 99" (Gov't Ex. 103). Deputy Fish interviewed FBI–2 on other occasions but took no notes of those interviews, nor did he make any written reports.

During the interview of FBI–2, the police drove with the informant by a house on Lapeer Street in the City of Saginaw which FBI–2 identified as Delgado's. Deputy Fish observed the address as "1502" Lapeer Street. Thereafter, Deputy Fish asked City Detective Bickle to obtain utility records for that address. However, instead Detective Bickle obtained tax assessment records, which listed the owner as Isabel Delgado.

Also as part of the investigation, FBI Agent Robert Howard obtained a criminal history report on the defendant from the Law Enforcement Information Network (LEIN), which disclosed that the defendant had pleaded guilty to possession of cocaine in 1995, and that he had been charged with other offenses which were dismissed.

After the October, 1999 interview of FBI–2, Deputy Fish contacted Agent Howard and told him that FBI–2 reported that he had seen ten kilograms of cocaine at 1502 Lapeer Street in April, 1999. Deputy Fish also relayed to Agent Howard that the utility records from 1502 Lapeer Street were in the name of "Delgado."

On December 16, 1999, Agent Howard sought a search warrant for 1502 Lapeer

Street, which he described in an affidavit as a "two-story single family residence with gray aluminum siding" with "[t]he numerals '1502' . . . located near the front door in black numbers. . . ." According to the affidavit, Agent Howard believed he would find "[u]nknown quantities of controlled substances" and other, related items located there.

In support of the affidavit, Agent Howard made the following statements:

10. FBI–2 stated that he/she has been told by Robelin on several occasions over the time that FBI–2 has known Robelin that Delgado is Robelin's supplier of cocaine. In April 1999, FBI–2 was at Delgado's residence located at 1502 Lapeer Street, Saginaw and personally observed 10 kilo's of cocaine there. Robelin and Delgado were also present at the residence at that time.

. . . . .

13. A review of Ricado Delgado II's criminal history shows one felony conviction for distribution of crack cocaine in 1994, a two count felony conviction for carrying concealed weapons in 1994, and one felony conviction for telecommunications-counterfeit device in 1998.

14. Affiant caused a utilities (water) check to be made on the above two locations to be searched. Service for 3216 Ruckle Street is listed to Robelin. Service for 1502 Lapeer Street is listed to Delgado.

. . . . .

Gov't Ex. 105.

As it turned out, 1502 Lapeer Street is a vacant lot. There is a house located at 1506 Lapeer Street, and it is owned by Cruz and Manual Guerra, the defendant's grandparents.

On December 17, 1999, agents of the FBI and BAYANET executed the search warrant and searched the house located at 1506 Lapeer Street. No drugs were found; however the agents did find and seize firearms, ammunition, several pieces of body armor, a large amount of cash, and an electronic scale, among other items. The defendant was not on the premises at the time of the search, although he was under surveillance. When the weapons and body armor were located, the information was relayed to surveilling officers and the defendant was stopped and arrested. During the search incident to the arrest, Saginaw Township police officers found a firearm and ammunition on the defendant's person.

The indictment followed.

## II.

The defendant filed two motions to suppress evidence. The first motion [dkt. # 17] challenges the search warrant as improper because it was based on an affidavit that contains information that was deliberately or recklessly false. Therein, the defendant points out that the street address for the Guerra house was wrong, that the defendant's prior criminal record is over-stated, and that no utility (water) records state that the house belongs to Delgado. The defendant argues that if the water records for 1502 Lapeer Street were in fact examined, as the search warrant affidavit avers, they would have disclosed the police officers' mistake because no utility service was ever provided for that address, which is a vacant lot. Finally, the defendant contends that paragraph ten of the affidavit is false because no government informant ever stated that he saw ten kilograms of cocaine at the Lapeer Street house.

In the second motion [dkt. # 19], the defendant contends that his arrest on December 17, 1999 was illegal because it was made absent probable cause, and the ensuing seizure of the weapon incident to the arrest was improper.

The government responded that the motion challenging the search warrant should be denied because the defendant lacked "standing" to contest the search of his grandparents' residence because he did

not live there. Further, although the government concedes that the information in the search warrant affidavit was inaccurate, the government argues that the inaccuracies were the result of mere negligence or innocent mistakes that did not rise to the level of deliberate falsehoods or reckless disregard for the truth.

In response to the defendant's second motion, the government argues that once Detective Winter, the arresting officer, learned that the results of the search of the Lapeer Street residence yielded large amounts of cash, assault weapons, bulletproof vests and a scale, he had probable cause that the defendant's automobile contained evidence of a crime and therefore could stop it without a warrant to search it.

The defendant responded to the government's argument that he lacked standing to challenge the search of the Lapeer Street home by filing an affidavit in which he avers:

2. That he is 27 years old and is the Grandson of Cruz and Manuel Guerra, who live at 1506 Lapeer Street, Saginaw, Michigan, a home which they have occupied since prior to Affiant's birth.

3. That Affiant is one of many grandchildren of Cruz and Manuel Guerra.

4. That Affiant's parents have been undergoing marital difficulties for several years with the family home on Arvin Drive being occupied by either Affiant's father or mother or both at various times.

5. That Affiant has always been close to his grandparents and has sought their advise [sic] and emotional support during his childhood and adulthood.

6. That Affiant would stay with his grandparents from time to time and the home was available for him at any time to stay with his grandparents and that Affiant frequently visits with his grandparents.

7. That Affiant was invited to and did use his grandparents home to keep personal papers and items knowing they would be safe and keep [sic] private there, said items including bank records; employment and income records; clothes and personal effects.

8. That during the period 1992–1993, while attending Great Lakes College, Affiant spent substantial time at his grandparents home and still has in storage there items that have been kept there with his grandparents knowledge and permission.

9. That Affiant had a reasonable expectation that neither her [sic] grandparents nor anyone else would interfere with his personal property and effects stored and kept at the home.

10. That as a result of the execution of a purported search warrant certain property owned by Affiant including bank and income records were seized by the police and Defendant is further charged with the possession of certain weapons and other items which based upon information and belief from police reports were taken from the home and with which Defendant is charged in the present case.

Affidavit of Ricardo Delgado, II.

The motion was referred by this Court's predecessor, the Honorable Victoria A. Roberts, to the Magistrate Judge who conducted an evidentiary hearing on June 9, 2000. The Magistrate Judge filed a Report and Recommendation on August 31, 2000 recommending that both motions be denied. The defendant filed timely objections to the Report and Recommendation and this Court scheduled argument on the motions and objections, which was held on October 13, 2000. The government filed a post-argument memorandum on October 16, 2000, and the Court now has all the submissions necessary to decide the motions.

For the reasons stated below, the defendant's motions to suppress evidence are **GRANTED**.

### III.

### A.

The defendant contends that the search of the Guerra home violated the Fourth Amendment, which states:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

█ The defendant did not own the house that was searched in this case; it belonged to his grandparents. Consequently, Delgado must carry his burden of establishing that his own Fourth Amendment rights were violated. *Rakas v. Illinois,* 439 U.S. 128, 130 n. 1, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). To do so, the defendant must show (1) that he had a subjective expectation of privacy in the premises that were searched or the items that were seized, and (2) that society is prepared to recognize that expectation as legitimate. *California v. Ciraolo,* 476 U.S. 207, 211, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986); *see United States v. Haydel,* 649 F.2d 1152, 1154 (5th Cir.1981).

In *United States v. McRae,* 156 F.3d 708 (6th Cir.1998), the Court of Appeals held that a defendant who lived in an abandoned house for one week did not have a legitimate expectation of privacy therein and therefore could not claim a Fourth Amendment violation when police entered the house without a warrant to seize drugs which the defendant was selling from that location. In reaching its conclusion, the Court relied on *United States v. Carr,* 939 F.2d 1442, 1446 (10th Cir.1991), in which the Court noted that important factors for determining whether the defendant had a legitimate expectation of privacy included "ownership, lawful possession, or lawful control of the premises searched." *McRae,* 156 F.3d at 711.

The Magistrate Judge in this case concluded that the defendant had "standing"[1] to bring the motion to suppress, but only as to the specific items of property in which he affirmatively acknowledged ownership. In so finding, the Magistrate Judge reviewed several cases in which persons had stored items of property at third parties' residences and he extracted from those cases the view that acknowledgment of ownership of the seized property is a critical factor in finding Fourth Amendment "standing."[2]

Compare, for instance, *United States v. Alberts,* 721 F.2d 636 (8th Cir.1983), with *United States v. Grunsfeld,* 558 F.2d 1231 (6th Cir.1977). In *Alberts,* the defendant was convicted of embezzling checks from a federal program. A FBI agent obtained a warrant to search the defendant's personal belongings which were kept in several plastic garbage bags, which the agent believed (and the search warrant stated) were stored at the defendant's aunt's residence. When the agents went to the aunt's house to execute the search warrant, the aunt told the agents that the defendant did not keep her belongings there, and directed the agents to the de-

---

1. In *Minnesota v. Carter,* 525 U.S. 83, 88, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998), the Supreme Court stated that "in determining whether a defendant is able to show the violation of his (and not someone else's) Fourth Amendment rights, the 'definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing.'" (quoting *Rakas v. Illinois,* 439 U.S. 128, 140, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)).

2. The Magistrate Judge quoted the following language from 5 LaFave, Search and Seizure § 11.3(c), p. 149 (3d ed. 1996): "It would seem clear beyond question that a defendant has standing if he is specifically permitted by the person with possessory interest in the premises to store some *specified effects* there and is also permitted to enter the premises to check on those effects from time to time" (emphasis by the Magistrate Judge).

fendant's half-sister's house. The agents proceeded to the half-sister's house a few days later and located and searched the garbage bags. They found check stubs and a check which were introduced in evidence at trial. The Court of Appeals held that the search was invalid because the warrant authorized a search of the garbage bags at the aunt's house, not at the half-sister's house. The government had argued that the "place to be searched" was the garbage bags themselves, but the Court rejected that argument because the warrant specified the aunt's house as the location where the garbage bags would be found; to extend the warrant to other locations, the Court observed, would "condone the use of a general warrant." *Id.* at 639. The Court then concluded that the defendant could raise the Fourth Amendment issue because she "maintained a legitimate expectation of privacy in the property that was searched." *Id.*

In *United States v. Grunsfeld, supra,* the defendants were convicted of conspiring to manufacture phencyclidine, and one of the defendants, Richard Flowers, challenged a search warrant which was executed at his brother's house where the agents seized a machine that processed the phencyclidine powder into tablets. The Court of Appeals held that Richard Flowers had no standing to contest the search because the only evidence of his relationship to the house was that his brother had given him a key and permission to enter. The Court concluded that Richard had no expectation of privacy in the premises. 558 F.2d at 1241. Nor did Richard demonstrate an interest in the seized tableting machine. *Id.* Consequently, Richard had no legitimate expectation of privacy either in the place searched or the thing seized.

■ The cases cited by the Magistrate Judge demonstrate that if a defendant does not have a legitimate expectation of privacy in the place searched, she may assert a Fourth Amendment violation nonetheless if she can claim a legitimate interest in the thing seized. However, the Magistrate Judge's extension of that rule to require a defendant, who has a legitimate expectation of privacy in the place searched, to also affirmatively claim ownership in the seized items presents, I believe, too narrow a view of the Fourth Amendment.[3] *See, e.g., United States v. Walter,* No. 96–1483, 1997 WL 588879, at *2 (6th Cir. Sept.22,1997) ("This court has been unable to uncover any cases in which a defendant was denied standing following a search of his home for items seized therein.").

To restate the focus of the inquiry in this case, the Court must determine whether Delgado had "an expectation of privacy in the place searched, and whether his expectation was reasonable." *Minnesota v. Carter,* 525 U.S. 83, 88, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998). "No one circumstance is talismanic" to this inquiry, *United States v. Haydel, supra,* 649 F.2d at 1154, and "property rights are neither the beginning nor the end of [the] inquiry." *United States v. Salvucci,* 448 U.S. 83, 92, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980). In *Haydel,* the Court of Appeals for the Fifth Circuit listed pertinent factors to include "whether the defendant has a possessory interest in the thing seized or the place searched, whether he has the right to exclude others from that place, whether he has exhibited a subjective expectation that it would remain free from government invasion, whether he took normal precautions to maintain his privacy and whether he was legitimately on the premises." *Haydel,* 649 F.2d at 1155.

In assessing these factors, the Court is guided by the Court of Appeals' decision in

---

3. Of course, if a defendant affirmatively *disclaims* ownership in the seized item, a different situation arises which leads to the issue of abandonment. *See, e.g., United States v. Frazier,* 936 F.2d 262, 265 (6th Cir.1991); *United*

States v. Knox, 839 F.2d 285, 294 (6th Cir. 1988), cert. denied, 490 U.S. 1019, 109 S.Ct. 1742, 104 L.Ed.2d 179 (1989). Cf. United States v. Sanders, 719 F.2d 882 (6th Cir.1983).

*U.S. v. Pollard,* 215 F.3d 643 (6th Cir. 2000). In that case, two defendants, Pollard and Rodriguez, were arrested in a house owned by Pollard's friend while the two defendants were preparing to sell cocaine to an informant and an undercover officer. Pollard had admitted the undercover officer into the house, but during the sale of the drugs the undercover officer gave a signal and several other police officers broke down the front door, entered the house and arrested the defendants. No arrest or search warrant had been issued. Both Pollard and Rodriguez claimed that the entry by police violated the Fourth Amendment. The trial court held that neither Pollard nor Rodriguez had "standing" to assert the Fourth Amendment violation. The Court of Appeals examined recent Supreme Court decisions to analyze that ruling.

The Court compared the decisions in *Minnesota v. Carter, supra,* and *Minnesota v. Olson, supra,* on the question of whether the defendants had a legitimate expectation of privacy in Pollard's friend's house. In *Carter,* the Supreme Court reviewed a decision of the Minnesota Supreme Court suppressing evidence initially discovered by a police officer who looked through a window of a ground floor apartment and saw Carter and others packaging white powder in what appeared to be a drug operation. The officer notified headquarters which used the information in preparing search warrant affidavits. The apartment did not belong to Carter; he was present for the sole purpose of packaging cocaine. The Supreme Court observed that although the text of the Fourth Amendment secures its protections to people in "their ... houses," in some circumstances "a person may have a legitimate expectation of privacy in the house of someone else." *Carter,* 525 U.S. at 88, 119 S.Ct. 469. Carter's was not such a circumstance, however, because he was not an overnight guest, he had no previous relationship with the apartment owner, the apartment itself was not a dwelling place for Carter, and he was merely present there for the purpose of the commercial, criminal enterprise. The Supreme Court concluded that Carter had no legitimate expectation of privacy in someone else's apartment.

In *Olson,* the Supreme Court held that the defendant's subjective expectation of privacy was legitimate because he was an overnight guest in his friend's apartment. The Court held that it "need go no further than to conclude, as we do, that Olson's status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable." *Olson,* 495 U.S. at 96–97, 110 S.Ct. 1684. The Court reasoned:

> To hold that an overnight guest has a legitimate expectation of privacy in his host's home merely recognizes the everyday expectations of privacy that we all share. Staying overnight in another's home is a long standing social custom that serves functions recognized as valuable by society. We stay in others' homes when we travel to a strange city for business or pleasure, when we visit our parents, children, or more distant relatives out of town, when we are in between jobs or homes, or when we house-sit for a friend. We will all be hosts and we will all be guests many times in our lives. From either perspective, we think that society recognizes that a house guest has a legitimate expectation of privacy in his host's home.

*Id.* at 98, 110 S.Ct. 1684.

Based on these decisions, the Court of Appeals in *Pollard* concluded that Rodriguez had "no standing" to contest the search because his relationship to the premises and its owner was transient.[4]

---

4. The Court stated: "We agree that Rodriguez has no standing to contest the search, because he had never been to the premises before and did not know the renter of the premises. Further, when Rodriguez came to the house he did not bring any personal possessions or

*Pollard,* 215 F.3d at 648. Pollard, on the other hand, had a legitimate expectation of privacy in the apartment where "[h]e had been friends for approximately seven years with the lessee ... and had been staying in the home earlier in the week." *Id.* at 647. The Court also noted that Pollard "occasionally spent the night at the residence and kept some personal belongings in a closet in the living room[,] ... sometimes ate meals with the family[,] ... [and] he was allowed to stay in the home even if the residents were not present." *Id.* at 647–48.

In this case, Delgado's unrefuted affidavit establishes that his grandparents' home was open to him and that he resided there on occasion. The Guerras' gave defendant permission to store his personal effects there and he expected those items to be safe and private. The defendant's grandparents resided in that dwelling for over twenty-seven years; the defendant's family home was somewhat unstable as a result of his parents' marital discord.

Delgado has manifested a subjective expectation of privacy in the home—*i.e.,* in the premises that were searched. Moreover, his relationship to those premises was substantial. He was not a transient and certainly enjoyed more than the privileges of an overnight guest. The affidavit suggests that the residence was a second home for him. If society recognizes and values the privacy interest of a house guest, as the Supreme Court held in *Olson,* then it is beyond peradventure that a grandchild's refuge in the home of his grandparents "is a long-standing social custom that serves functions recognized as valuable by society." *Olson,* 495 U.S. at 98, 110 S.Ct. 1684.

■ The Court concludes, therefore, that Delgado has a legitimate expectation of privacy in the place that was searched and may assert a claim that his Fourth Amendment rights were violated by the search of his grandparents' home and seizure of the items removed therefrom.

### B.

Having determined that the defendant may assert a Fourth Amendment violation, the Court turns to the question of whether the erroneous facts contained in the affidavit of Agent Howard undermine the validity of the search warrant.

In *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the Supreme Court held:

[W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

*Id.* at 155–56, 98 S.Ct. 2674.

In this case, the defendant pointed to several specific statements contained in the search warrant affidavit that he claimed were false including the erroneous street address, representations of defendant's criminal convictions that never occurred, the wrong owner discovered by examining the wrong municipal records, and a representation by an informant that was never made. These allegations are specific. The government has acknowledged the errors in the affidavit, and, at

luggage. Finally, he stated he planned to leave immediately after the cocaine sale and catch a plane back to his home state of Texas." *Pollard,* 215 F.3d at 648.

oral argument on the motions and objections to the Magistrate Judge's Report and Recommendation, the government conceded that absent the allegation in paragraph ten of the affidavit relating to the presence of cocaine on the premises, probable cause to search the Guerra house was not established. The defendant, therefore, has satisfied the threshold showing required by *Franks* for a hearing on the validity of the search warrant.

The issues to be determined, then, are (1) whether the analysis of statements for their veracity is limited to the statements of the affiant only, or should be extended to other informers, and (2) whether the statements themselves were deliberately false or made in reckless disregard for the truth.

### 1.

Seizing upon language in *Franks,* the Magistrate Judge concluded in this case that impeachment of the statements in the search warrant affidavit is limited solely to those of the affiant himself.[5] However, the complete sentence which the Magistrate Judge excerpted from the *Franks* opinion reads:

> The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, *not of any non-governmental informant.*

*Franks,* 438 U.S. at 171, 98 S.Ct. 2674 (emphasis added).

The omitted language is important, especially in light of an observation made earlier in the opinion concerning the Court's prior decision in *Rugendorf v. United States,* 376 U.S. 528, 84 S.Ct. 825, 11 L.Ed.2d 887 (1964). In that case, the Supreme Court declined to reach the issue decided in *Franks* because the claimed misstatements in the affidavit in that case were "of only peripheral relevancy to the showing of probable cause...." 376 U.S. at 532, 84 S.Ct. 825. The *Franks* Court noted, however:

> In characterizing the affidavit in *Rugendorf* as raising no question of integrity, the Court took as its premise that police could not insulate one officer's deliberate misstatement merely by relaying it through an officer-affiant personally ignorant of its falsity.

*Franks,* 438 U.S. at 164 n. 6, 98 S.Ct. 2674.

 It is clear that a search warrant affiant cannot be held accountable for the misstatements, inaccuracies, or even outright lies of a citizen-informant on which the affiant reasonably relies.[6] *See e.g., United States v. McAllister,* 18 F.3d 1412 (7th Cir.1994); *United States v. Southard,* 700 F.2d 1 (1st Cir.1983).

Other courts have articulated a different rule, however, when the informant who provides the errant information to the search warrant affiant is also a government agent or police officer. *See* 2 LaFave, Search and Seizure, § 4.4(b), pp. 492–93 (3d ed.1996). In *United States v. DeLeon,* 979 F.2d 761 (9th Cir.1992), the Court held that "[a] deliberate or reckless omission by a government official who is not the affiant can be the basis of a *Franks* suppression." *Id.* at 764. The Court reasoned that a contrary holding would allow government officials to deliberately or recklessly withhold information from the Court that is material to the determination of probable cause. *Accord United States v. Calisto,* 838 F.2d 711 (3d Cir.1988) (con-

---

5. The Magistrate Judge stated: "[t]he *Franks* case specifically states that '[t]he deliberate falsity or reckless disregard whose impeachment is permitted today is *only that of the affiant....*' *Franks,* 438 U.S. at 171, 98 S.Ct. 2674." (emphasis by the Magistrate Judge). Report and Recommendation, p. 15.

6. The search warrant affiant, however, must recite the basis of his reliance on a confiden-

tial source, and his reliance must be objectively reasonable under the totality of the circumstances. *See Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), as modified by *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

trary ruling would seriously jeopardize Fourth Amendment rights), *United States v. Pritchard,* 745 F.2d 1112 (7th Cir.1984) (*Franks* also covers a situation where one government agent recklessly misrepresents information to a second agent, who innocently includes false information in affidavit), *United States v. Kennedy,* 131 F.3d 1371, 1376 (10th Cir.1997), *United States v. Wapnick,* 60 F.3d 948, 956 (2d Cir.1995), *cert. denied,* 518 U.S. 1021, 116 S.Ct. 2556, 135 L.Ed.2d 1075 (1996).

■ The Court believes that the cases previously cited accurately state the applicable rule, and the Court holds that the *Franks* analysis applies not only to the affiant but must extend also to government and police officers who furnish erroneous information to the affiant as well. Consequently, the Court must examine the statements of Agent Howard, Deputy Fish and Detective Bickle to determine if they were deliberately false or made with reckless disregard for the truth.

### 2.

■ In *Franks,* the Supreme Court stated that erroneous statements constituting mere negligence or innocent mistake are insufficient to void a warrant. *Franks,* 438 U.S. at 171, 98 S.Ct. 2674. *See also United States v. Ayen,* 997 F.2d 1150, 1152 (6th Cir.1993). The Magistrate Judge concluded, and the defendant conceded in oral argument before the Court, that Agent Howard's misrepresentation of the LEIN report of defendant's criminal history was an innocent mistake. Likewise, errors regarding the identity of the property owner and the street address of the house constituted negligent conduct. That information, therefore, need not be excised from the warrant affidavit.

The statement that an informant saw ten kilograms of cocaine at the Guerra house—a statement that is admittedly false—is another matter. Deputy Fish testified that he told Agent Howard that FBI–2 told him he had seen ten kilograms of cocaine at 1502 Lapeer Street, which is arguably consistent with Fish's notes. Fish also testified that he did not intentionally lie to Agent Howard. Fish also acknowledged that the informant never told him he had seen drugs at the Lapeer Street house, and in fact affirmatively stated that he had never been there. Deputy Fish testified that he was in the back seat of the police vehicle and FBI–2 and his partner were in the front seat during the interview. However, Deputy Fish has no good reason to account for the discrepancy between his notes and the actual statements of the informant. (Deputy Fish stated: "I can't explain the difference. . . ." Transcript of Hearing, p. 58).

The government argues that Deputy Fish's statement was not deliberately false, and cites *United States v. Clapp,* 46 F.3d 795 (8th Cir.1995), for the proposition that First Amendment libel cases are a proper source for construing the "reckless disregard for the truth" *Franks* language. In *Clapp,* the Court reviewed authority that evaluated the information which a government agent "believed or appropriately accepted," *id.* at 800, to determine whether the agent " 'in fact entertained serious doubts as to the truth of the affidavits or had obvious reason to doubt the accuracy of the information contained therein.' " *Id.* at 801 (quoting *United States v. Dorfman,* 542 F.Supp. 345, 369 (N.D.Ill.1982)), *aff'd sub nom. United States v. Williams,* 737 F.2d 594 (7th Cir. 1984), *cert. denied,* 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985).

The Sixth Circuit has taken a more direct approach in *United States v. Bennett,* 905 F.2d 931 (6th Cir.1990). In that case, police officers sought a warrant to search the defendant's home for drugs and material used for manufacturing drugs. A police detective stated in a search warrant affidavit that a confidential informant told him that the informant had seen several bags of marijuana in the defendant's house and in an adjacent barn. At the hearing challenging the search warrant, the detective testified that in fact the confidential

informant told him that he purchased marijuana from the defendant, who did not keep it in the house but went outside to retrieve it in order to complete the sale. Although the informant never saw bags of marijuana in the house or barn, he did see the defendant walk into the barn and come out with marijuana which he sold to the confidential informant. The trial court denied the motion to suppress, finding that the affiant made no statements which were false or in reckless disregard for the truth. The Court of Appeals reversed. The Court stated:

> Officer Horn admitted at the hearing that the informant had not told him that he had seen marijuana in the barn and that the informant had not told him that the informant had seen several bags of marijuana in the house. Moreover, the affidavit is silent concerning the informant's ever having bought any marijuana from Bennett.
>
> Because Horn, by his own testimony, admitted that the statements in his affidavit were untrue, statements that clearly are material to the affidavit, we find that the district court's determination that there were no intentionally false statements nor any statements made in reckless disregard for the truth was clearly erroneous.

*Id.* at 934.

In this case, Deputy Fish made a representation to Agent Howard that was false and was incorporated into the search warrant affidavit as material information to persuade the magistrate that there was probable cause to believe that controlled substances and related paraphernalia would be found at the Lapeer Street house. The recorded conversation between Fish and FBI–2 does not suggest confusion or allow for a misinterpretation. After FBI–2 stated that he saw "the dope ... at their house ... on Ruckle," Fish asked point-blank, "[H]ave you ever been on Lapeer Street?" FBI–2 responded, "No, no, no.... No, I ain't never [sic] been over there." Gov't Ex. 102.

A frank denial should give the listener "obvious reasons to doubt the accuracy" of the contrary statement Fish relayed to Agent Howard. Fish said FBI–2 saw drugs at the Lapeer Street house; FBI–2, in response to a clarifying question from Fish, said that he had never even been there.

■■■ Under *Franks*, the defendant has the burden of establishing that the challenged statement was deliberately false or made in reckless disregard for the truth by a preponderance of the evidence. Based on the authority cited above, the Court finds that the defendant has satisfied that burden. Paragraph ten of the search warrant affidavit, therefore, must be stricken.

### 3.

The government has acknowledged at the motion argument that the remaining allegations in the search warrant affidavit are insufficient to establish probable cause that the contraband (drugs, paraphernalia and weapons) would be located at the Guerras' home on Lapeer Street. Probable cause has been defined as reasonable grounds for belief which is more than mere suspicion but less than prima facie proof. *United States v. One 1984 Cadillac*, 888 F.2d 1133, 1135 (6th Cir.1989). *See also, Illinois v. Gates*, 462 U.S. 213, 235, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Absent paragraph ten, the affidavit mentions 1502 Lapeer Street only with reference to Delgado and Robelin being seen entering the house. There are no facts indicating that drugs will probably be found at the Lapeer Street house or that drug activity has occurred at this address. There are also no facts that indicate that a drug sale took place "very near" the Lapeer Street house. *See United States v. Martin*, 920 F.2d 393 (6th Cir.1990). The statements that remain in the affidavit are not sufficient to provide reasonable grounds to believe that drugs and guns would be found on the premises.

Accordingly, the Motion to Suppress Evidence Obtained Pursuant to Improper Search Warrant [dkt. # 17] is **GRANTED.**

### IV.

The defendant also moves to suppress the evidence obtained during his arrest and ensuing search of the vehicle. At the evidentiary hearing before the Magistrate Judge, Michigan State Police Detective Michael Winters testified that he ordered the defendant's car stopped based on the report that weapons and body armor were discovered during the search of the Lapeer Street house. The government has agreed that if the search warrant is invalidated, the stop and search of the vehicle is tainted as well.

The Court finds that the stop and search of the defendant's automobile was the fruit of the illegal search of the Lapeer Street house, and, accordingly, the evidence discovered therein must be suppressed as well. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

The Motion to Suppress Evidence Seized During the Automobile Stop and Search [dkt. # 19], therefore, is **GRANTED.**

**IT IS SO ORDERED.**